**Phillip D. HOPGOOD, et al., Plaintiffs,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, et al., Defendants.**

Civ. No. 90–1988 (JP).

United States District Court,
D. Puerto Rico.

Dec. 10, 1993.

---

Harold D. Vicente González, Santurce, PR, for plaintiffs.

Carlos S. Látimer, Látimer, Biaggi, Rachid, Rodríguez Surís & Godreau, San Juan, PR, for defendants.

## OPINION AND ORDER

PIERAS, District Judge.

Plaintiff, Phillip D. Hopgood, filed this diversity action for breach of contract and wrongful dismissal. The plaintiff alleges that he was unjustly dismissed from his position as a broker in violation of his employment contract. Defendant, Merrill Lynch, Pierce, Fenner and Smith, Inc. (hereinafter "Merrill Lynch"), contends that it dismissed the plaintiff for just cause and that their actions did not violate the employment contract. Defendant's Motion for Summary Judgment (docket No. 67) filed on August 9, 1993, and plaintiff's Opposition (docket No. 68), filed on August 23, 1993, are now before the Court. For the reasons set forth below, defendant's motion is hereby **GRANTED.**

## I. BACKGROUND

Merrill Lynch acquired the San Juan, Puerto Rico, branch of Kidder Peabody, Inc. during October of 1989. Hopgood, a vice president at Kidder Peabody, had been working for the brokerage firm since November 24, 1984. After the acquisition took place, Hopgood entered into negotiations with Merrill Lynch to continue his employment as a broker. Hopgood reached an agreement with Merrill Lynch, and signed an employment contract on November 2, 1989. The contract established Hopgood's duties and compensation, and provided for an absolute confidentiality agreement between Merrill Lynch and Hopgood regarding the terms of the contract. Apart from its duties under the special compensation package, Merrill

Lynch agreed to employ Hopgood for an indefinite term. As part of his compensation package, Hopgood received a loan in the amount of $12,492.00. The employment contract included a promissory note which established the terms of the loan. The promissory note provided that Hopgood would repay the loan in three yearly installments of $4,164.00 due on October 30, 1990, October 30, 1991, and October 30, 1992. However, if Hopgood remained employed at Merrill Lynch when the payments were due, Merrill Lynch would forgive that part of the loan. The entire amount of the loan would be forgiven if Hopgood remained employed at Merrill Lynch through October 30, 1992. Finally, the promissory note stated that if Hopgood's employment with Merrill Lynch *terminated for any reason,* the unpaid balance of the principal sum would become payable the day after termination.

The honeymoon between Hopgood and Merrill Lynch did not last long. Merrill Lynch dismissed Hopgood along with eleven employees on February 23, 1990, allegedly pursuant to a personnel reduction plan due to their critical economic situation. Three of the twelve people dismissed were previous Kidder Peabody brokers. The next day two local newspapers [1] reported the job cuts at Merrill Lynch, and mentioned that at least some of the employees fired were considered low producers. The newspaper articles did not mention any names nor did they use derogatory remarks about any employees other than to state that some were considered low producers. The articles made no remarks about any employment contract or its terms.

Hopgood did not, and to this date has not, paid any monies under the promissory note. On July 20, 1990, Hopgood filed the present action. Merrill Lynch filed a counterclaim on October 10, 1990, alleging that Hopgood owes it $12,000.00 [2] by virtue of the promissory note he executed.

---

1. The local newspapers that published the story are: 1) *The San Juan Star,* and 2) *El Nuevo Día.*

2. While the employment contract established that the loan was made for $12,492.00, Merrill

Lynch filed the counterclaim for only $12,000.00. Answer to the First Amended Complaint (docket No. 16).

## II. PLAINTIFFS' ALLEGATIONS

Plaintiffs argue that Merrill Lynch breached the employment contract in two ways. First, Merrill Lynch breached the contract by dismissing Hopgood on February 23, 1990. Although the contract specifies that employment would be for an indefinite term, the plaintiff alleges that the parties agreed during the contract negotiations that the employment contract had a minimum duration of three years. Merrill Lynch's agent allegedly told Hopgood, just before signing the employment contract, that his employment was guaranteed for at least three years. Hopgood claims that the word "indefinite" in the contract refers only to the maximum term of employment. Hopgood further alleges that the contract was made with a minimum duration of three years because the loan would be forgiven at that time. Thus, Merrill Lynch allegedly gave Hopgood the loan as an inducement for him to remain with the firm for at least three years, as Merrill Lynch wished to retain Hopgood's Kidder Peabody accounts. By dismissing Hopgood only four months after signing the contract, Merrill Lynch reneged on its promise to employ him for at least three years.

Second, plaintiffs allege that Merrill Lynch issued public statements (*i.e.*, newspaper articles appearing in *The San Juan Star* and *El Nuevo Día*) concerning Hopgood's alleged poor performance at the firm, and such statements constitute a breach of the provision of confidentiality in the employment contract. Plaintiffs claim that the statements made by Merrill Lynch were deliberate efforts to weaken Hopgood's position to enforce his contractual rights, to deflect public attention from Merrill Lynch's weakened performance in the securities market, and to obscure the extravagant salary package that they had extended to some of its personnel in Puerto Rico.

Plaintiffs allege that Merrill Lynch's actions caused foreseeable economic and personal injuries. In addition to seeking damages for the breach of contract and wrongful dismissal claims, the plaintiffs claim damages for emotional pain and suffering, and lost income. For Hopgood's breach of contract, wrongful dismissal, and emotional pain claims, the plaintiffs seek a total of $1,000,000.00 in damages. Angela Ríos Vázquez, Hopgood's wife, claims $500,000.00 for her emotional pain and anguish. For the same reason, Peter Hopgood Morales and Pablo Hopgood Morales, Hopgood's sons, claim $200,000.00 each. Finally, the conjugal partnership claims $85,000.00 as lost income for 1990, and the same amount each year for the time that Hopgood remains unemployed. Thus, plaintiffs claim a combined total of about $2,000,000.00 in damages. Plaintiffs also seek costs and reasonable attorney's fees.

## III. DEFENDANTS' ALLEGATIONS

The defendant denies breaching the employment contract or having any bad faith or malicious intent against the plaintiff. Merrill Lynch claims that it dismissed Hopgood pursuant to an employee reduction plan because of its critical economic situation at the time. Merrill Lynch denies that any agreement guarantying Hopgood's employment for three years ever existed. Merrill Lynch contends that the employment terms were exclusively controlled by the written contract, which states expressly that Merrill Lynch agreed to employ Hopgood for an indefinite period of time. Hopgood's claims about a minimum employment term of three years are allegedly just an effort to subvert the intention and language of the employment contract.

Furthermore, Merrill Lynch maintains that the confidentiality agreement included in the contract covered only the terms of the contract. Thus, a party would breach the confidentiality agreement only if it made public to third parties the contents of said contract. The defendant points out that no newspaper article published specifically mentioned Hopgood or the terms of his employment contract with Merrill Lynch. Even though the newspaper articles referred to certain brokers as "low producers," Merrill Lynch argues that it did not breach the confidentiality agreement included in the employment contract because the terms of the contract were never revealed.

Merrill Lynch argues that it only wishes to enforce the terms of the employment con-

tract, which the plaintiffs want to subvert with inadmissible parole evidence. Pursuant to the unambiguous and valid contract, Merrill Lynch seeks to recover $12,000.00 from Hopgood for the unpaid loan.

## IV. UNCONTESTED FACTS

■ Pursuant to local Rule 311.12 a summary judgment movant must serve and annex to the motion a separate, short, and concise statement of material facts as to which the movant contends there are no genuine issues to be tried. All material facts set forth in the statement will be deemed admitted unless controverted by the opposing party. *See Laracuente v. Chase Manhattan Bank*, 891 F.2d 17, 19 (1st Cir.1989); *Rivas v. Federación de Asociaciones Pecuniarias de Puerto Rico*, 929 F.2d 814, 816 n. 2 (1st Cir.1991). A careful examination of the record reveals the following uncontested facts:

1) Merrill Lynch acquired the Kidder Peabody, Inc. Puerto Rico branch on October of 1989. After the acquisition, Merrill Lynch employed most of the Kidder Peabody brokers.

2) Hopgood entered into an employment contract with Merrill Lynch on November 2, 1989. Both parties accept the employment contract and the promissory note, and there is no dispute as to their validity or language. The contract and its promissory note provide in part as follows:

*Agreement, Paragraph 2*—Merrill Lynch agrees to employ Hopgood for an indefinite term and Hopgood accepts such employment pursuant to the following terms contained herein.

*Agreement, Paragraph 4(a)*—Merrill Lynch will make a loan to Hopgood in the amount of twelve thousand four hundred ninety two dollars ($12,492.00). The loan and its terms and conditions are evidenced by the Promissory Note attached hereto as Exhibit A. The loan monies will be treated as compensation for tax purposes if and when forgiven in accordance with the terms of the Promissory Note.

*Agreement, Last Paragraph*—It is further expressly agreed and understood that the terms of this agreement are confidential, and shall only be disclosed to the parties to the agreement, ... the obligation of confidentiality is absolute. ...

*Note, Second Paragraph*—Such payment will be made in the manner as follows: Four thousand one hundred sixty four dollars ($4,164.00) on or before October 30, 1990, four thousand one hundred sixty four dollars ($4,164.00) on or before October 30, 1991, and four thousand one hundred sixty four dollars ($4,164.00) on or before October 30, 1992; except that if the undersigned is continuously in the employ of Merrill Lynch from the date hereof, up to and including, the date a payment becomes due and payable, Merrill Lynch will forgive that portion of the loan and that payment will not be made.

*Note, Fifth Paragraph*—If the undersigned's employment with Merrill Lynch *terminates for any reason*, the unpaid balance of the principal sum shall become due and payable one (1) day after the undersigned's employment has terminated. (Emphasis in the original).

3) Merrill Lynch gave Hopgood and other Kidder Peabody brokers an employment contract to induce them to stay with Merrill Lynch. Merrill Lynch was interested in keeping the Kidder Peabody brokers because keeping the brokers was a way of ensuring that their accounts would stay at Merrill Lynch.

4) Mr. Tom Smith, an attorney working for Merrill Lynch in New York, prepared Hopgood's employment contract.

5) After his dismissal, Merrill Lynch gave Hopgood severance pay pursuant to Law No. 80 of Puerto Rico.

6) Newspaper articles regarding the Merrill Lynch job cuts appeared in the February 24, 1990, issue of *The San Juan Star* and *El Nuevo Día*.

## V. THE SUMMARY JUDGMENT STANDARD

■ Rule 56(c) of the Federal Rules of Civil Procedure provides for the entry of summary judgment in a case where "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993); *Brennan v. Hendrigan,* 888 F.2d 189, 191 (1st Cir.1989); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 894 (1st Cir.1988). Summary judgment is appropriate where, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, there is not the slightest doubt as to whether a genuine issue of material fact exists. *Kennedy v. Josephthal & Co.,* 814 F.2d 798, 804 (1st Cir.1987); *Peckham v. Ronrico Corp.,* 171 F.2d 653 (1st Cir.1948). A "genuine" issue is one that is dispositive, and which consequently must be decided at trial. *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir. 1989); *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A material fact, which is defined by the substantive law, is one which affects the outcome of the suit and which must be resolved before attending to related legal issues. *Mack,* 871 F.2d at 181.

The party filing a motion for summary judgment bears the initial burden of proof to show "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Thereafter, the burden shifts to the non-movant to provide the Court, through the filing of supporting affidavits or otherwise, with "some indication that he can produce the quantum of evidence [necessary] to enable him to reach the jury with his claim." *Hahn v. Sargent,* 523 F.2d 461, 468 (1st Cir.1975); *see also Brennan,* 888 F.2d at 191. The non-movant cannot rest upon mere allegations or denial of the pleadings. Fed. R.Civ.P. 56(e). Indeed, the non-movant must affirmatively show that "sufficient evidence supporting the claimed factual dispute [exists] to require a jury or judge to resolve the parties' differing versions of truth at trial."

*First National Bank v. Cities Service Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). On issues where the non-movant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion. *See Anderson,* 477 U.S. at 256–57, 106 S.Ct. at 2514–15; *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990). "Even when elusive concepts like motive or intent are in play, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Pagano,* 983 F.2d at 347 (quoting *Medina–Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990)).

## VI. THE EMPLOYMENT CONTRACT

### A. Term of Employment

The employment contract is both the centerpiece and deciding factor in the dispute between Hopgood and Merrill Lynch. The parties disagree as to the meaning of the contract signed on November 2, 1989, and the Court must wrestle with the different allegations presented. The contract states in paragraph number two (2) that Merrill Lynch agrees to employ Hopgood for an "indefinite" term, and that Hopgood accepts such employment. While the statement seems clear and unambiguous, plaintiff argues that during contract negotiations it was agreed that the term of employment would last and extend, at least, through October 30, 1992.[3] Thus, plaintiffs allege that the employment contract had a minimum duration of three years. The defendant argues that the contract is clear, and that the parties agreed only on an indefinite term of employment, not a three year minimum contract. If the plaintiff is entitled to submit evidence to controvert the terms of the written contract, then the motion for summary judgment must be denied because the trier of fact would necessarily have to evaluate the credibility of the parties in its assessment of the evidence. On the other hand, if the parol evidence

---

**3.** Plaintiffs' allegation of a three year minimum contract was not a part of the initial complaint filed on July 20, 1990. The allegation was included later in the First Amended Complaint filed almost six (6) months later, on December 3, 1990.

offered by the plaintiffs is inadmissible, the summary judgment motion must be granted because the written terms of the contract would control the outcome of the dispute.

▮▮▮▮ Puerto Rico Civil Code Article 1233 is applicable to the dispute in this case. Article 1233 states:

> If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed.
>
> If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail.

31 L.P.R.A. § 3471 (1991). Article 1233 determines the manner in which courts should interpret contracts under dispute as to the meaning of their terms. The Article is strict in its mandate that courts should enforce the literal sense of a written contract, unless the words are somehow contrary to the intent of the parties. *Marina Ind. Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 72 (1983); *see also Luce & Co. v. Junta Rel. Trabajo*, 86 D.P.R. 425, 433–437 (1962). For Article 1233 purposes, a term is considered "clear" when it is sufficiently lucid to be understood to have one particular meaning, without room for doubt. *Sucn. Ramirez v. Tribunal Superior*, 81 D.P.R. 357, 361 (1959); *see Catullo v. Metzner*, 834 F.2d 1075, 1079–80 (1st Cir. 1987); *see also* 1978 Op.Sec.Jus. No. 15. Once a court determines that the terms of a contract are sufficiently clear so that only one meaning is possible, the court cannot dwell on the "alleged" intent of the parties at the time they entered into the contract.

▮▮▮▮ The Parol Evidence Rule supports the letter and spirit of Article 1233. To decide the applicability of the Parol Evidence Rule, federal courts look to state law. *Catul-*

*lo*, 834 F.2d at 1079. Puerto Rico Rule of Evidence 69 excludes extrinsic evidence concerning the terms of an agreement when an agreement, whether written or oral, is clear and unambiguous. 32 L.P.R.A. App. IV, R. 69(B) (1983).[4] Only when an agreement leaves doubts as to the intention of the parties should the court look beyond the literal terms of the contract. *Catullo*, 834 F.2d at 1079; *see also Sucn. Ramirez*, 81 D.P.R. at 361.

▮▮▮▮ The word "indefinite," as used in paragraph two (2) of the employment agreement is lucid, clear, and unambiguous. Plaintiff's argument that the contract would last at least through October 30, 1992, is unpersuasive and contrary to the clear meaning of the word "indefinite." A contract cannot have a three year minimum requirement and at the same time be for an indefinite term. It is clear that Hopgood entered into an employment at-will contract with Merrill Lynch. While it is possible to draft a contract in such a way that the parties agree to a minimum term of employment followed by an indefinite term, the terms of the contract at issue do not in any manner indicate such an intention.[5] Paragraph two of the employment contract, placed prominently at the beginning of the document, is the only place where a term of employment is discussed. Because the term "indefinite" is clear, the literal sense of the contract should be enforced and no evidence regarding the alleged intent of the parties should be allowed.

▮▮▮▮ The terms of the promissory note are also clear. The promissory note states that if Hopgood's employment terminates for any reason, the unpaid balance of the principal sum shall become due and payable one day after termination.[6] The words "terminate for any reason" are underlined in the

---

**4.** Rule 69(B) states:
> When in an oral or written agreement, either public or private, all the terms and conditions constituting the true and final intention of the parties have been included, such agreement shall be deemed as complete, and therefore, there can be between the parties, or successors in interest, no evidence extrinsic to the contents of the same....

**5.** Paragraph two (2) of the employment agreement provides that "Merrill Lynch agrees to em-

ploy Hopgood for an indefinite term and Hopgood accepts such employment pursuant to the following terms contained herein."

**6.** The paragraph in the promissory note provides that "[i]f the undersigned's employment with Merrill Lynch *terminates for any reason*, the unpaid balance of the principal sum shall become due and payable one (1) day after the undersigned's employment has terminated." (Emphasis in the original).

original promissory note signed by Hopgood. Plaintiffs argue that because Merrill Lynch hired Hopgood in an effort to keep his Kidder Peabody accounts, the employment contract only contemplated his repayment of the cash loan if he decided to quit his job within the first three years. In their opposition to the summary judgment motion plaintiffs allege that the word "terminate" referred only to the possibility that Hopgood would quit his job, and that such word did not contemplate his dismissal. Plaintiff's argument could merit consideration if the word "terminate" had been used by itself. However, the contract stated explicitly the phrase "terminates for any reason." These words were even underlined in the contract to draw attention to their meaning and importance. The clause is not amenable to plaintiff's interpretation. If termination had meant only "if the employee resigns," the words "for any reason" could not have formed a part of the promissory note. Once again, plaintiffs' argument fails because the meaning of the clause in the promissory note is clear, lucid, and unambiguous. The alleged evidence of a contrary intent is not admissible.

Not only is plaintiffs' argument contrary to the plain and clear meaning of the clause in the promissory note, but the termination clause in the note supports the interpretation that Merrill Lynch hired Hopgood for an indefinite term. If employment could terminate for any reason, then it is not possible that the employment contract could have a minimum duration of three years. Puerto Rico Civil Code Article 1237 states that contract clauses should be interpreted in relation to one another, giving to those clauses that might be unclear the meaning which a reading of the contract as a whole gives them. 31 L.P.R.A. § 3475 (1991). Since none of the contract clauses are unclear, it is not necessary to utilize Article 1237 to interpret this contract. However, when both clauses (the term of employment clause and the termination clause) are read together, the Court is even more certain that the employment contract did not contemplate a minimum term of employment.[7]

To escape the scythe of Article 1233, plaintiff argues that the "substantive law of Puerto Rico considers the intent of the parties as the paramount criterion for determining the legal import of contractual obligations." Opposition to Motion for Total Summary Judgment, p. 4 (docket No. 68) (hereinafter "Opposition"). While plaintiff's statement is not incorrect, it is a misguided argument which does not address the import of Article 1233. To substantiate the proposition that circumstantial evidence is admissible in the present situation, the plaintiff relies on a decision by the Puerto Rico Supreme Court, *Merle v. West Bend Co.*, 97 D.P.R. 403 (1969). Opposition, p. 5. The plaintiff maintains that *Merle* stands for the proposition that in order to fix the scope of contractual obligations under Puerto Rico's Civil Code, it is necessary to examine the intention of the parties when they entered into the contract. Since the intent of the parties will triumph even over the words of the contract when the words go against the intent of the parties, the plaintiff believes that he is entitled to introduce evidence to prove the alleged intent of the parties. However, the facts and law as explained in *Merle* do not support plaintiff's arguments.

In *Merle* the plaintiff filed a claim for damages against two different defendants under a dealership contract. The plaintiff entered into a settlement stipulation with one of the codefendants. Under the settlement agreement, the plaintiff agreed to hold the settling codefendant harmless from any kind of obligation, claim, or duty resulting from the lawsuit initiated by him. The remaining codefendant, West Bend Co., requested the dismissal of the complaint against it. West Bend argued that since both codefendants were treated as joint tortfeasors, the release in the settlement agreement must necessarily also release all defendants from liability.

7. The employment term clause and the termination clause do not form part of the same document. The employment term clause is part of the employment contract, and the termination clause is part of the promissory note. However, the promissory note was attached to the employment contract, and the contract made a direct reference to the promissory note. Since both documents form part of the same transaction, they should be examined together for purposes of understanding their meaning.

The Supreme Court of Puerto Rico disagreed, and ruled that as a matter of law the release of one tortfeasor would not necessarily release the other tortfeasors. *Id.* at 405–09. The intention of the parties when they enter into settlement agreements should control the issue of release of joint tortfeasors. *Id.* at 409–10. Thus, the Court needed to examine the settlement agreement in order to determine the intention of the parties with regards to the release of joint tortfeasors. However, the Court did not examine extrinsic evidence to try to determine the intent of the parties. Instead, the Court examined the text of the agreement and held that it was clearly not the intention of the parties to release West Bend Co. from liability. *Id.* at 412, 415. The clear terms of the settlement agreement reflected the intention of the parties at the time they entered into the contract and controlled the outcome of the case.

 Contrary to what the plaintiff argued in its opposition to the motion for summary judgment, *Merle's* holding and rationale do not defeat defendant's motion for summary judgment. In general terms, it is correct to state that the intentions of the parties fixes the scope of the contractual obligations in the Civil Code. *Merle*, 97 D.P.R. at 409–10. The intent of the parties will prevail over the contract when the language of the contract goes against the original intent of the parties. *Id.* at 410; *see also Coop. La Sagrada Familia v. Castillo*, 107 D.P.R. 405, 417 (1978). However, there is no need to go beyond the language of a contract when the intentions of the parties are clear. Article 1233 specifies exactly when extrinsic evidence should be considered. As explained before, only if the literal terms of the contract are in doubt will it be necessary in the first place to examine or interpret the contract with the help of extrinsic evidence. To argue that the intention of the parties takes precedence over a written contract does not change the analysis under Article 1233. The reason that clear and unambiguous terms

will not be altered is not that the written word has taken precedence over the intention of the parties when they entered into the contract; rather, under Article 1233, the clear terms of a contract are given preference over subsequent allegations because these terms are supposed to represent in the first place the real intent of the parties at the time they entered into the contract. "[T]o sum up: the value of words does not lie in themselves but rather in what they say." Manresa, *Comentarios al Código Civil Español*, Tomo VIII, vol. 2, p. 686 (4th ed., 1967).[8]

In *Chaves v. Coop. de Crédito de Isabela*, 103 D.P.R. 892 (1975), the Supreme Court of Puerto Rico confronted a situation similar to the case at bar. Mrs. Chaves had been working for the Cooperativa for about eight years. Her employment conditions were set forth in a written contract every time she received a salary increase. None of the contracts included a term of employment, and the parties entered into the last contract on June 30, 1969. Two months after signing the last contract, the Board of Directors of the Cooperativa dismissed Mrs. Chaves. Mrs. Chaves filed a complaint alleging that although the contract did not specify a term of employment, the Cooperativa had agreed to employ her for at least two years. Other than her own allegations, Mrs. Chaves could not produce any evidence to substantiate her assertions that the employment contract contemplated a two year minimum. The Supreme Court of Puerto Rico decided that the allegations presented by Mrs. Chaves, in light of the provisions of the contract, did not warrant the admissibility of extrinsic evidence to refute or alter the written contract. The Court refused to entertain Mrs. Chaves allegations that the intent of the parties at the time the contract was signed had been different from the clear terms of the contract. Similarly, in the case at bar, Hopgood does not have any evidence, other than his own allegations, which can refute the clear terms of the contract.

---

**8.** Article 1233 is derived from article 1281 of Spain's Civil Code, which has an identical wording. It is important to note that Spain's jurisprudence regarding Article 1281 supports the same conclusions reached by Puerto Rico's courts under Article 1233. When an obligation is imposed under clear and absolute terms there is no need to resort to the rules of interpretation since the literal meaning will control. *See* Manresa, *Comentarios al Código Civil Español*, Tomo VIII, vol. 2, p. 682–728 (4th ed., 1967).

In *Marina Ind. Inc. v. Brown Boveri Corp.,* 114 D.P.R. 64 (1983), the Supreme Court of Puerto Rico reaffirmed its prior decisions in *Merle, Chaves,* and *La Sagrada Familia* regarding Article 1233 interpretation; the intent of the parties will prevail over the words of the contract *only when* the words go against such intent. *Marina,* 114 D.P.R. at 69–70. The parties in *Marina* had been doing business together since 1954, when Brown Boveri gave Marina Electrical Supplies, Inc. the exclusive representation of its products in Puerto Rico, Haiti, and the Dominican Republic. In 1970, the parties entered into a new exclusive dealership contract. Boveri unilaterally terminated the agreement three years later. Marina sued Boveri for breach of contract under Law No. 75. The applicability of Law No. 75 to the contract depended on whether the contractual relationship between the parties began on 1954 or 1970. Thus, the dispute in *Marina* centered around a contract clause which stated that the document constituted the entire agreement between the parties, and annulled any prior agreements. *Id.* at 70. The literal terms of the contract specified that all prior agreements were void and null, and that the new contract represented the entire agreement between the parties. The trial court declined to admit defendant's extrinsic evidence as to the alleged intent of the parties, ruled against the defendant, and the defendant appealed. The defendant claimed that the parties never intended to supersede prior agreements, and that the clause in the contract which stated that all prior agreements were void and null merely represented standard wording used in all contracts.

The Puerto Rico Supreme Court did not consider important that the trial court refused to admit the documentary extrinsic evidence because the evidence did not contradict the terms of the contract. Defendant's allegations of a continuing contractual relationship represented the only evidence available to refute the clear terms of the contract. The Court found that the strict mandate of Article 1233 prevented the Court from going beyond the literal terms of the contract be-

cause the terms in dispute were both clear and precise. *Id.* at 72.[9] The Puerto Rico Supreme Court repeated again the lesson imparted in *Merle:* It is not necessary to explore alleged and unsubstantiated statements that a contract does not reflect the true intent of the parties if the terms of the contract are clear on their face.

Both *Marina* and *Chaves* expose the problems present in plaintiff's arguments regarding Article 1233. While plaintiffs claim that intent is paramount, they fail to understand that the clear terms of their contract, pursuant to Article 1233, are considered an embodiment of the undisputable intent of the parties as they entered into the contract. Only if the terms of a contract are not clear will courts look elsewhere for evidence of intent. The contract that Hopgood signed was clear. If the Court followed plaintiffs' interpretation of the Civil Code, the utility of contracts would be diminished considerably. Contracts could always be challenged subsequently with mere allegations of a different intent.

In the case at bar, as in *Marina* and *Chaves,* Hopgood's unsubstantiated allegations of a fixed term of employment represent the only evidence available to refute the clear terms of the contract. Merrill Lynch's loan to Hopgood, which provided for complete forgiveness after three years of employment, is not evidence of a minimum term of employment, specially in light of the clear terms of the contract. While it may be unfortunate that Merrill Lynch dismissed Hopgood and that he is bound to repay the loan, that is exactly what he agreed to do under the contract. Hopgood is an educated and intelligent person. He had many years of experience as a financial consultant, and had even attained the position of vice president at Kidder Peabody. He certainly must have been exposed to various contracts during his lifetime and work experience. In short, Hopgood was a sophisticated party negotiating an employment contract who knew or should have known the import of the

---

9. The Court explained:
 The strict mandate of Art. 1233 forces us to abide by the literal terms of the contract when, as in this case, there are no doubts as to the intention of the parties. *Marina,* 114 D.P.R. at 72.

contract that he signed. Hopgood might have made a bad bargain, but that does not entitle him to have a court of law change the outcome of his bargain. Therefore, the Court finds that the employment contract between Hopgood and Merrill Lynch was made for an indefinite term. Merrill Lynch hired Hopgood as an employee at-will.

## B. Breach of the Confidentiality Agreement

Paragraphs 15 through 17 of the first amended complaint (docket No. 13) allege that Merrill Lynch issued statements to the public which violated the agreement for complete confidentiality included in the employment contract. Plaintiffs maintain that the statements were made deliberately, and with the bad faith intention of weakening Hopgood's position to enforce his contractual rights. These statements allegedly affected Hopgood's professional reputation, and caused him and his family emotional pain and anguish. The employment contract provided in part that "the terms of this agreement are confidential, and . . . the obligation of confidentiality is absolute. . . ." It is undisputed that two newspaper articles concerning Merrill Lynch's job cuts appeared on the February 24, 1990, issue of *The San Juan Star* and *El Nuevo Día.* Although Merrill Lynch denies having made any public statements, we will assume for purposes of the summary judgment motion that the newspaper articles were based on a public statement made by Merrill Lynch.

The article in *The San Juan Star* [10] provided some basic information regarding Merrill Lynch's job cuts. Specifically, the article mentioned that twelve employees had lost their jobs, and that of those twelve, eight were considered low producers. It was pointed out that three of the eight brokers dismissed were part of the Kidder Peabody team. Hopgood's name was never mentioned, nor did the article identify anyone else. Most significant, the article did not mention anything about Hopgood's terms of employment under the contract. The article noted that Merrill Lynch had reported a loss of $213 million dollars for 1989, and projected between 3,000 to 5,000 layoffs nationwide. Finally, the article indicated that since the stock market crash of 1987, about 40,000 brokers nationwide had lost their jobs.

The article in *El Nuevo Día* [11] is very similar to the article in *The San Juan Star.*

10. The article read:

Merrill Lynch & Co. slashed 12 jobs from its staff Friday in a severe cost-cutting measure. The figure, though small, represented 17 percent of the local brokerage office's staff of 71. "That's the extent of the cutbacks at this time," said a Merrill Lynch spokesman, who indicated there might be more firings in the offing. Eight of the twelve employees who lost their jobs were brokers who were considered low producers, the spokesman said. The remainder were operations employees. The layoffs will cut overhead costs by reducing the space the branch occupies to one floor instead of two. Merrill Lynch's operation now will be consolidated in its lobby office. Brokers from the local Kidder Peabody & Co. office, which Merrill Lynch acquired last October, will move from the ninth floor offices of the Banco Popular Center to the lobby location on Monday. Three of the eight brokers laid off were part of the Kidder team. The institutional brokers will continue to operate from their 18th floor offices, said Miguel Corco, managing director of the local branch. The layoffs will have no impact on operations, Corco said. The message, however, is clear to brokers who earn their living from commissions: Produce or there will be more job cuts ahead, one Merrill Lynch employee said. Merrill Lynch, the nation's largest securities firm, reported a record net loss of $213 million for 1989 and projected massive layoffs ranging from 3,000 to 5,000. Since the 1987 stock market crash some 40,000 employees of brokerage firms nationwide have lost their jobs. In the wake of a securities fraud scandal last year, Drexel Burnham Lambert sold or closed its Puerto Rico brokerage office, and later shut down its local investment banking subsidiary. Despite the tight market, Citicorp is recruiting brokers for its new brokerage unit, a venture that has met delays, and Chase Manhattan reportedly may take the brokerage route in Puerto Rico.

11. The article read:

Merrill Lynch fired this week twelve employees, that is, approximately 17% of their entire personnel in the island. The group that was fired included mostly the least productive brokers of the firm, as explained by Timothy Lee, spokesperson for Merrill Lynch in New York. It also included the firing of clerical personnel. According to a source close to the company, no more cuts are expected. Some of the brokers who were fired were Merrill Lynch brokers and some others were former Kidder Peabody brokers. Merrill Lynch bought Kidder's of-

The article mentioned that Merrill Lynch dismissed 12 employees, which accounted for 17% of the total workforce in the island. The article did specify that some of the brokers dismissed were from the Kidder Peabody team. Again, the article mentioned that the group dismissed consisted mostly of the least productive brokers in the firm. Hopgood's name or the terms of his employment contract were not mentioned. Finally, the article stated that the dismissals formed part of a reduction and consolidation policy implemented by Merrill Lynch two years before.

█ Plaintiffs have not presented a scintilla of evidence to substantiate their allegations of a breach of the confidentiality agreement in the employment contract.[12] Their allegations fail to state a cause of action for breach of contract or bad faith. Once again, the contract's language states that the confidentiality agreement covers only the "terms" of the employment contract. Even assuming that the newspaper articles were based on Merrill Lynch's public statements, no cause of action exists for a breach of contract since the newspaper articles did not divulge any confidential information regarding the agreement. The statements in the articles, which mention that some of the employees dismissed were considered low producers, are the only comments which could be considered negative. Absent an express contract provi-

sion, it is ludicrous to expect that an employer cannot divulge the fact that some employees have been dismissed or the reasons for their dismissal. Plaintiff's name was not even mentioned in the articles. If Hopgood ever decided to look for employment elsewhere, the fact that he had been dismissed would have been disclosed to any potential employer. Also, when the articles are read as a whole, they seem to indicate that the reductions came as a result of a critical economic situation which affected not only Merrill Lynch, but the financial market as a whole. With the lack of genuine issues as to any material fact, Hopgood does not have a claim for breach of contract based on the confidentiality agreement.

## VII. WRONGFUL DISCHARGE CLAIM

█ In addition to the breach of contract claims, the plaintiffs presented in the First Amended Complaint a wrongful discharge claim. As a matter of state law, Hopgood's wrongful discharge claim must be dismissed. "Absent an express contract to the contrary, an employee hired for an indefinite term is terminable at the will of the employer without notice." *Weatherly v. International Paper Co.,* 648 F.Supp. 872, 875 (D. Puerto Rico 1986). Act No. 80 governs wrongful discharge in Puerto Rico. 29 L.P.R.A. § 185(a)

fices on October 1989. Lee explained that the decision to buy Kidder was good for the company. Prior to the sale Merrill Lynch had approximately 41 brokers and Kidder had 30; between the two, they had close to 71 professionals. If only 12 persons were fired it was a good decision, said Lee. The lay-offs in Merrill Lynch form part of a reduction and consolidation policy that was implemented by the company two years ago. The last round took place on November of this year, when Merrill Lynch announced the lay-off of hundreds of brokers. The aforesaid cuts did not affect Puerto Rico. A year and a half ago, the company closed Capital Markets, its institutional division in Puerto Rico. On said occasion it fired 15 persons. However, approximately a month ago Merrill Lynch announced its intention to reopen Capital Markets. Lee mentioned yesterday that the present cuts have only affected, and will only affect, the company's retail sales division. The lay-offs will allow the company to close one of the two offices it had at Banco Popular. The office on the 11th floor will be closed and its operations consolidated in the

first floor premises. "It is more accessible to the clients," Lee said. Lee explained that the measures taken are in part the result of the changes which take place when there is a merger, as it happened in this case with Kidder's former personnel. But they also reflect the difficult times that have affected the financial markets since the end of 1987, when there occurred an abrupt fall in the stock market. "It was something that we were expecting since the completion of the merger," said a member of the industry. "Always, in every office, there is someone who is not carrying the weight that is expected of them," he added.

12. Surprisingly, in their opposition to the Motion for Summary Judgment (docket No. 68), the plaintiffs did not address Merrill Lynch's arguments regarding the alleged breach of confidentiality. Rather, the plaintiffs described defendant's motion as a "futile attempt," and proceeded to oppose the motion by submitting a copy of a previously filed motion (filed on October 21, 1991) in opposition to a partial summary judgment.

(Supp.1989).[13] Puerto Rico courts have not recognized a right for at-will employees to sue for wrongful discharge outside of the remedies given under Act No. 80 for discharge without cause. *Alvarado Morales v. Digital Equipment Corp.*, 669 F.Supp. 1173, 1184 (D.Puerto Rico 1987). Because Hopgood was an at-will employee, any claim for wrongful discharge is covered under Act No. 80, which is an exclusive remedy in Puerto Rico. *Id.* at 1183–84. Since Merrill Lynch has already paid Hopgood severance pay in compliance with Act No. 80, the claim for wrongful discharge must be dismissed.

## VIII. DEFENDANT'S COUNTERCLAIM

█ Merrill Lynch filed a counterclaim against the plaintiffs on October 10, 1990, for $12,000.00. Merrill Lynch argues that the plaintiff owes the money under the promissory note, which stated that if plaintiff's employment "terminates for any reason, the unpaid balance of the principal sum shall become due and payable...." Both parties accepted the validity and language of the employment contract and the promissory note. Merrill Lynch dismissed Hopgood before any payments were made under the promissory note. Therefore, under the contract and promissory note, Hopgood owes the entire amount of the loan to Merrill Lynch. In view of the fact that Hopgood accepted the contract as written, and its obligation to pay the balance of the loan upon termination of employment, Merrill Lynch is entitled to recover $12,000.00 from Hopgood. Since Hopgood's claims must be dismissed, it is then proper that judgment be entered for defendant counter-claimant, Merrill Lynch, on its counterclaim.

## IX. CONCLUSION

In accordance with the undisputed facts, Hopgood and Merrill Lynch entered into an at-will employment contract. Pursuant to such contract, Merrill Lynch could dismiss Hopgood at any time without any further obligation, other than the obligations imposed under Act No. 80, which Merrill Lynch satisfied. While Hopgood alleges that the employment contract was supposed to provide for a fixed term of employment, Article 1233 prevents him from introducing evidence to controvert the clear and unambiguous terms of the contract. Plaintiffs face the same problem with their claim for a breach of the confidentiality agreement. Hopgood's unsubstantiated allegations are inadmissible under Article 1233 to controvert the clear meaning of the contract clause. No genuine issues of material fact remain regarding the breach of contract claims, or the wrongful discharge claim. Since the Court finds that Hopgood has no causes of action against Merrill Lynch, and that Merrill Lynch is entitled to recover from Hopgood the $12,000.00 loaned under the contract, the Court hereby **GRANTS** defendant's motion for summary judgment. Judgment shall be entered accordingly.

IT IS SO ORDERED AND ADJUDGED.

---

13. Act No. 80 provides in part:
 Every employee in commerce, industry or any other business or place of employment designated hereinafter as the establishment, in which he works for compensation of any kind, under contract without a fixed time, who is discharged from his employment without good cause shall be entitled to receive from his employer, in addition to the salary he may have earned:
 (a) the salary corresponding to one month as indemnity;
 (b) an additional progressive indemnity equivalent to one week for each year of service.