**CITIBANK, N.A., Plaintiff,**

v.

**ALLIED MANAGEMENT GROUP, INC.; Rafael Portela Rodriguez, Maritza Botella Barcelo, and their Conjugal Partnership; The Two Towers Corporation; Investors and Developers Consultants, Inc.; Allied Investment, Inc.; Marles Incorporated, Defendants.**

Civil No. 06–1193 (GAG).

United States District Court, D. Puerto Rico.

June 7, 2007.

Angel Sosa–Baez, Jaime E. Toro–Monserrate, Toro, Colon, Mullet, Rivera & Sifre, Sifre, PSC, San Juan, PR, for Plaintiff.

Jose L. Gonzalez–Castaner, Gonzalez Castaner & Morales Cordero Law Office, San Juan, PR, for Defendants.

## *OPINION AND ORDER*

GELPI, District Judge.

This is a diversity action for breach of contract. Citibank commenced it after Defendants allegedly failed to pay Citibank post-closing fees arising from certain loan transactions whereby Citibank provided Defendants with financing to acquire the buildings known as Citibank Towers and Plaza del Este commercial center. The matter is before the court on the Portela Defendants'[1] motion for partial summary judgment. In this motion, the Portela Defendants argue that Citibank is not entitled to collect any post-closing fees with respect to the Citibank Towers loans because its right to collect such fees expired under the terms of the loan agreements and because Citibank released the Portela Defendants from any claims arising out of those loans. After reviewing the pleadings and pertinent law, the court **GRANTS** the Portela Defendants' motion for partial summary judgment (Docket No. 92).

## I. Relevant Factual and Procedural Background

The parties' statements of material facts, credited only to the extent either admitted or properly supported by record citations in accordance with Local Rule 56 and viewed in the light most favorable to Plaintiff, reveal the following undisputed material facts. On March 31, 1988, Lincoln Realty, Inc. ("Lincoln") executed two loan agreements with Citibank to purchase the buildings known as Citibank Towers. *See* Docket No. 94 at ¶ 2. The first agreement is in the amount of eleven million dollars ($11,000,000.00) and has no provision for the payment of post-closing fees. *Id.* at ¶ 3. The second agreement is in the amount of two million five hundred thousand dollars ($2,500,000.00) and contains a provision for the payment of post-closing fees in the form of a participation interest in the rental income and sales proceeds of Citibank Towers. *Id.* at ¶ 4. Section 11 of this loan agreement describes the post-closing fees. Of relevance to this case, Section 11.1 states:

> The obligation of the Borrower to deposit the Excess Income in the escrow account and the right of the Bank to receive the Post Closing Fee agreed to hereunder shall survive the repayment of this Loan or the Loan and Security Agreement (whether by prepayment or otherwise) and shall continue until the Building Complex is sold to or refinanced with a third party unaffiliated to or controlled by the Borrower and/or the Guarantors (as such term is herein defined) provided further that it is of the essence hereof and Borrower so accepts that this payment covenant shall be sub-

---

1. The term refers collectively to Rafael Portela Rodriguez, Maritza Botella Barcelo and the Conjugal partnership composed by both of them, Allied Management Group, Inc., Allied Investment, Inc., and the Two Towers Corp. These Defendants guaranteed the loans in question.

ject to the representation made by Borrower in Section 6.1.15 hereof.

*See* Exhibit II, Docket No.1 at p. 46. With respect to the interest in the sales proceeds of Citibank Towers, Section 11.2 provides:

> Notwithstanding anything to the contrary in this Agreement, the Bank shall have, at its option, the right to demand and be paid the agreed Post Closing Fee equal to Fifty Percent (50%) of the Excess Sales Income based on the fair market value of the Building Complex agreed to between Borrower and the Bank at the Maturity Date of the Loan and Security Agreement in the event the Building Complex has not been sold by that date, provided that in the event there is no agreement as to the referenced fair market value, then in such event the aforesaid fair market value for the Building Complex shall be determined by the following appraisal procedures. . . .

*Id.* at 46–47. Additionally, this loan agreement provided Citibank with "a right of first offer with respect to any proposed refinancing of the Properties." *Id.* at 41.

On June 13, 1990, Lincoln executed another loan agreement with Citibank. *Id.* at ¶ 11. The total amount of this loan is three million eight hundred fifty thousand dollars ($3,850,000.00). *Id.* at ¶ 12. In this loan agreement, Defendants restated their commitment to pay the post-closing fees under the second 1988 loan agreement. *Id.* at ¶ 14. Section 11 of this loan agreement describes the post-closing fees. Of relevance to this case, Section 11.1 states:

> The obligation of the Borrower to deposit the Excess Income in the escrow account and the right of the Bank to receive the Post Closing Fee agreed to hereunder shall survive the repayment of the Loan and Security Agreement or the Loans or this Agreement (whether by prepayment or otherwise) and shall continue until the Building Complex is sold to or refinanced with a third party unaffiliated to or controlled by the Borrower and/or the Guarantors (as such term is herein defined) provided further that it is of the essence hereof and Borrower so accepts that this payment covenant shall be subject to the representation made by Borrower in Section 6.1.23 hereof.

*See* Exhibit III, Docket No. 1 at p. 38. With respect to the interest in the sales proceeds of Citibank Towers, Section 11.2 provides:

> Notwithstanding anything to the contrary in this Agreement, the Bank shall have, at its option, the right to demand and be paid the agreed Post Closing Fee equal to Fifty Percent (50%) of the Excess Sales Income based on the fair market value of the Building Complex agreed to between Borrower and the Bank on March 30, 1991 and every third anniversary of the said date thereafter or at the time of refinancing with any third party in the event the Building Complex has not been sold or refinanced by that date, provided that in the event there is no agreement as to the referenced fair market value, then in such event the aforesaid fair market value for the Building Complex shall be determined by the following appraisal procedures. . . .

*Id.* at 38–39. Additionally, this loan agreement provided Citibank with "a right of first offer with respect to any proposed refinancing of the Properties." *Id.* at 34.

In mid 1997, Lincoln decided to refinance the Citibank Towers loans. *See* Docket No. 94 at ¶ 19. Shortly thereafter, Lincoln asked Citibank to provide the loan for the refinancing. *Id.* Unable to reach an agreement with Citibank, Lincoln refi-

nanced the Citibank Towers loans with third parties Chase Manhattan Bank and Bank Trust on September 4, 1998. *Id.* at ¶ 20. These financial institutions were neither affiliated with nor controlled by the borrower or the guarantors. *Id.*

On March 31, 2005, Lincoln sold the Citibank Towers. *Id.* Alleging that Defendants failed to pay post-closing fees in connection with the Citibank Towers loans and another loan agreement not relevant to the motion before the court, Citibank filed this suit on February 22, 2006. *See* Docket No. 1. On February 14, 2007, the Portela Defendants moved for partial summary judgment. *See* Docket Nos. 92–94. Citibank opposed this motion on March 9, 2007. *See* Docket Nos. 96–97. On March 19, 2007, the Portela Defendants filed a reply to Citibank's opposition. *See* Docket No. 98. Citibank filed a sur-reply on April 18, 2007. *See* Docket No. 112.

## II. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. *Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1st Cir.2004).

The moving party has the burden of establishing the nonexistence of a genuine issue of material fact. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. This burden has two components: (1) an initial burden of production that shifts to the nonmoving party if satisfied by the moving party; and (2) an

ultimate burden of persuasion that always remains on the moving party. *Id.* at 331. The moving party may discharge its burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.*

After the moving party makes this initial showing, the "burden shifts to the nonmoving party with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997) (citing *Celotex,* 477 U.S. at 322–25, 106 S.Ct. 2548). To meet this burden, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The court must view the record and all reasonable inferences in the light most favorable to the nonmoving party. *Id.* If the court finds that some genuine factual issues remain, the court must deny the motion. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Legal Analysis

▇▇▇ At issue in this case is whether Citibank's right to collect post-closing fees arising from the Citibank Towers loans expired under the term of the loan agreements. "As a civil law jurisdiction, Puerto Rico eschews common law principles of contract interpretation in favor of its own civil code derived from Spanish law." *Borschow Hosp. and Medical Supplies, Inc. v. Cesar Castillo Inc.,* 96 F.3d 10, 15 (1st Cir.1996) (citing *Guevara v. Dorsey Labs., Div. of Sandoz, Inc.,* 845 F.2d 364, 366 (1st Cir.1988) ("The Supreme Court of Puerto Rico has made clear that the common law of the United States is not controlling when filling gaps in the civil law sys-

tem.")). Thus, the court turns to Article 1233 of Puerto Rico's Civil Code, which "determines the manner in which courts should interpret contracts under dispute as to the meaning of their terms." *Hopgood v. Merrill Lynch, Pierce, Fenner & Smith,* 839 F.Supp. 98, 104 (D.P.R.1993), *aff'd,* 36 F.3d 1089, 1994 WL 510135 (1st Cir.1994). Article 1233 provides:

> If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulation shall be observed.

> If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail.

P.R. Laws. Ann. Tit. 31 § 3471 (1990). In essence, Article 1233 "mandates that courts enforce the literal sense of a written contract, unless the words are somehow contrary to the intent of the parties." *Home Ins. Co. v. Pan American Grain & Mfg. Co., Inc.,* 286 F.Supp.2d 190, 194 (D.P.R.2003). When the agreement is clear and unambiguous, the court should ignore extrinsic evidence and enforce the terms of the contract. *Borschow,* 96 F.3d at 15–16. *See also Fernandez–Fernandez v. Municipality of Bayamon,* 942 F.Supp. 89, 94 (D.P.R.1996) ("Once a court determines that the terms of a contract are sufficiently clear so that only one meaning is possible, the court cannot dwell on the 'alleged' intent of the parties at the time they entered into the contract."); *Nike Intern. Ltd. v. Athletic Sales, Inc.,* 760 F.Supp. 22, 24 (D.P.R.1991) ("Where contract terns and clauses are clear and un-ambiguous courts should abstain from speculating about possible intentions of parties and should interpret them accord-ing to their will expressed at the time of its execution."). For Article 1233 pur-poses, "an agreement is 'clear' when it can 'be understood in one sense alone, without leaving any room for doubt, controversies

or difference of interpretation.'" *Bor-schow,* 96 F.3d at 15 (quoting *Executive Leasing Corp. v. Banco Popular de Puerto Rico,* 48 F.3d 66, 69 (1st Cir.1995)).

Here, the Portela Defendants argue that according to the clear language of the Citi-bank Towers loans, Citibank's right to col-lect post-closing fees ended on September 4, 1998, the date when Lincoln refinanced with Chase and Bank Trust. The relevant provision is Section 11.1 of the 1988 and 1990 loan agreements. This provision states that "[t]he obligation of the Borrow-er to deposit the Excess Income in the escrow account and the right of the Bank to receive the Post Closing Fee ... shall survive the repayment of this Loan ... (whether by prepayment or otherwise) and shall continue until the Building Complex is sold to or refinanced with a third party unaffiliated to or controlled by the Borrow-er and/or the Guarantors...." *See* Exhibit II, Docket No.1 at p. 46; Exhibit III, Docket No. 1 at p. 38. The Portela Defen-dants interpret this provision as ending Citibank's right to collect post-closing fees on the date that Lincoln refinanced the Citibank Towers loans.

Citibank contends that the Portela De-fendants' interpretation is incorrect for several reasons. First, Citibank maintains that Section 11.1 refers to the obligation to deposit Excess Income in an escrow ac-count, not to the obligation to pay post-closing fees. The court disagrees. Sec-tion 11.1 covers both "[t]he obligation of the Borrower to deposit the Excess In-come in the escrow account *and* the right of the Bank to receive the Post Closing Fee...." *Id.* (emphasis added). The bank's right to receive the post-closing fee is synonymous to the borrower's obligation to pay the post-closing fee. Thus, the court finds that Section 11.1 also refers to the borrower's obligation to pay post-clos-ing fees.

■ Second, Citibank argues that the "until" provision in Section 11.1 limits the period during which the Rental Income post-closing fee would arise, not the period during which it could be collected. This argument is unavailing. Section 11.1 provides that the borrower's obligation to deposit Excess Income in the escrow account and the bank's right to receive post-closing fees survive the repayment of the loans *"until the Building Complex is sold or refinanced with a third party unaffiliated to or controlled by the Borrower and/or the Guarantors." Id.* (emphasis added). Excess Income includes both the Rental Income post-closing fee and the Sales Income post-closing fee. *See* Exhibit II, Docket No.1 at pp. 41–42; Exhibit III, Docket No. 1 at p. 34. Moreover, an interpretation that Section 11.1 limits the period during which post-closing fees would arise is flawed because it fails to give meaning to the provision about the bank's right to receive post-closing fees. The court rejects such an interpretation because "[i]t is well-established that courts should avoid interpretations that render a provision of an agreement surplusage." *In re Advanced Cellular Systems, Inc.,* 483 F.3d 7, 12 (1st Cir.2007) (citing Restatement (First) of Contracts § 236 (1932)). The only reading of Section 11.1 that takes into account all the words and the sentence structure is that Citibank's right to receive post-closing fees expired on the date that Lincoln refinanced the Citibank Towers loans.

Third, Citibank posits that if the Portela Defendants' interpretation is correct, then Citibank's right to collect post-closing fees would be at the mercy of the borrower's will. Specifically, Citibank states that if the obligation to pay Sales Income post-closing fee could arise with the refinancing of the Citibank Towers loans, then it is unreasonable to say that the obligation to pay also expires on the same day that it

arises. The court is not persuaded. Both loan agreements in question provided Citibank with "a right of first offer with respect to any proposed refinancing of the Properties." *See* Exhibit II, Docket No.1 at p. 41; Exhibit III, Docket No. 1 at p. 34. Here, the undisputed evidence is that Lincoln gave Citibank in mid 1997 the opportunity to refinance the Citibank Towers loans. *See* Docket No. 94 at ¶ 19. At that time, Citibank could have exercised the right to demand the Sales Income post-closing fee. This is because Section 11.2 of the loan agreements in question granted Citibank the right to demand payment of Sales Income post-closing fee even before any sale or refinancing of the Citibank Towers. *See* Exhibit II, Docket No.1 at pp. 46–47; Exhibit III, Docket No. 1 at pp. 38–39. Nonetheless, after the parties were not able to reach an agreement on the refinancing terms, Citibank did not exercise such right. Thus, Citibank allowed its right to expire.

Finally, Citibank argues that under the terms of the loan agreements, it could choose which event (sale or refinancing) triggered the obligation to pay post-closing fees. The court disagrees. Section 11.1's plain language provides that the bank's right to receive post-closing fees survives repayment of the loans until the Building Complex is sold or refinanced. *See* Exhibit II, Docket No.1 at pp. 41–42; Exhibit III, Docket No. 1 at p. 34. This section does not state that Citibank has a right to choose which event triggers the obligation to pay post-closing fees. The occurrence of either event is sufficient to end Citibank's right to collect post-closing fees.

In light of the above, the court finds that Citibank is not entitled to collect any post-closing fees with respect to the Citibank Towers loans because its right to collect such fees expired under the clear terms of the loan agreements. Because the terms

of the loan agreements are clear, the court need not consider extrinsic evidence or dwell on the "alleged" intent of the parties. *Fernandez–Fernandez,* 942 F.Supp. at 94. *See also Borschow,* 96 F.3d at 15–16. Likewise, having found that Citibank's right to collect post-closing fees expired, the court will not decide whether Citibank released the Portela Defendants from any claims arising out of the Citibank Towers loans.

## IV. Conclusion

For the foregoing reasons, the Portela Defendants' motion for partial summary judgment (Docket No. 92) is hereby **GRANTED**.

**SO ORDERED.**