MEDINA & MEDINA,
Plaintiff, Appellee,

v.

COUNTRY PRIDE FOODS, LTD.,
Defendant, Appellant.

MEDINA & MEDINA,
Plaintiff, Appellant,

v.

COUNTRY PRIDE FOODS, LTD.,
Defendant, Appellee.

Nos. 86–2033, 86–2060.

United States Court of Appeals,
First Circuit.

Oct. 7, 1988.

Salvador Antonetti with whom Fiddler, Gonzalez & Rodriguez, Hato Rey, P.R., was on brief, for Country Pride Foods, Ltd.

Luis E. Dubon, Jr. with whom Dubon & Dubon, Hato Rey, P.R., was on brief, for Medina & Medina.

---

Before BREYER and TORRUELLA, Circuit Judges, and RE,* Judge.

PER CURIAM.

We certified this case to the Puerto Rico Supreme Court 825 F.2d 1 (1st Cir.1987). We have received a response. *Medina & Medina v. Country Pride Foods, Ltd.*, No. CE-87-447 (P.R. Supreme Court, June 30, 1988). In view of the Court's opinion (official translation attached as Appendix A), this case is *remanded* to the district court to determine whether adequate pre-withdrawal notice was given to plaintiff-appellant.

APPENDIX A

(Translation)

IN THE SUPREME COURT OF PUERTO RICO

No. CE-87-447

Certification

Medina & Medina, Plaintiff

v.

Country Pride Foods, Ltd., Defendant

MR. JUSTICE HERNANDEZ DENTON delivered the opinion of the Court.

San Juan, Puerto Rico, June 30, 1988

The United States Court of Appeals for the First Circuit has certified to this Court an important issue regarding Act No. 75 of June 24, 1964, as amended, 10 L.P.R.A. § 278 *et seq.*, or Dealer's Contracts Act. Since this case is particularly suited for dealing with the issue certified, we state below the facts of the case:

I

Plaintiff Medina & Medina (Medina) is a collective mercantile partnership organized under the laws of Puerto Rico in 1969. It distributes meat and poultry products. The defendant, Country Pride Foods, Ltd. (Country Pride) sells poultry products as a corporation organized under the laws of the United Kingdom, with offices in Arkan-

sas. In 1977, Country Pride appointed Medina as its exclusive agent and distributor for all its products in Puerto Rico. The contract effectively contained no time limit. Product prices were periodically set by mutual agreement and fluctuated according to changes in the Georgia market, a recognized industry guideline.

According to the findings of fact of the U.S. District Court for the District of Puerto Rico, in March 1978, Country Pride demanded higher prices for its products. In May 1978, Medina accepted an increase in the prices. One month later, Country Pride demanded an additional increase in prices. In October, with the increase still under negotiation, Country Pride proposed to change its rigid pricing structure to an open market pricing structure. In November, Country Pride changed its original proposal to a formula arrangement of higher prices than the existing ones, to begin on December 1, for a 90-day period. Medina rejected this formula and counterproposed one with lower prices. Country Pride agreed to Medina's formula for a 90-day period, but all deliveries would be "C.I.F. San Juan" ("cost, insurance, and freight"), with payment by "sight draft against ocean bills of lading." Medina advised that the sight draft payment condition was unacceptable.

On November 27, Country Pride restated its position: a) Medina's prices at Country Pride's payment terms, or b) open price formula. Medina again rejected the payment terms alleging prior problems with shortages and surpluses in shipments and also shipments of expired products. Medina counterproposed a sight draft payable fifteen days after receipt of the product. Negotiations continued but by November 30, it was evident that an impasse had been reached. On December 4, Country Pride advised Medina that a shipment of goods had been sent and that payment was due by sight draft against ocean bills of lading. Later on, Medina made another proposal as to the payment terms, to wit, payment seven days after receipt of the product. Coun-

---

* Chief Judge of the United States Court of International Trade, sitting by designation.

try Pride rejected this proposal and reiterated its position: "1) our price, your credit terms, 2) your price, our credit terms."

Unable to reach an agreement, on December 7, Country Pride announced its withdrawal from the Puerto Rican market; Medina accepted the withdrawal. Country Pride then requested payment for the last shipment, but Medina stated that payment would be made according to pre-November terms. Country Pride demanded a transfer of funds against a commercial invoice to be telexed. Medina retorted that title to shipped goods passed upon tender to carrier at port of shipment, and that Country Pride had no right to condition delivery upon payment of the goods. Country Pride rejected Medina's claim on December 12, and also advised that the agency agreement was terminated.

Medina subsequently resorted to the United States District Court for the District of Puerto Rico and filed a suit under the Puerto Rico Dealer's Act, Act No. 75 (10 L.P.R.A. § 278 *et seq.*), claiming that Country Pride had unilaterally terminated their distribution agreement without just cause. Defendant filed a motion for summary judgment raising, *inter alia*, that Act No. 75 should not be construed as if saying that the principal had to pay large damages when completely withdrawing from the Puerto Rican market, without taking advantage of the clientele developed by the distributor. The District Court, adopting a narrow construction of the term "just cause" denied the motion for summary judgment. After the trial, the Court found for plaintiff. Country Pride appealed and the Court of Appeals certified to us the following question, under Rule 53.1 of the Rules of Civil Procedure, 32 L.P.R.A., App. II, R. 53.1, and Rule 27 of the Rules of this Court, 4 L.P.R.A., App. I–A, R. 27; *Pan Ame. Comp. Corp. v. Data Gen. Corp.*, 112 D.P.R. 780 (1982):

> Where there is a contract of indefinite time period, with price and credit terms left open to negotiation, and the parties negotiate in good faith but cannot reach an agreement as to price and credit, does Law 75 prohibit the supplier from unilaterally and completely withdrawing from the market, when the supplier makes no attempt to appropriate the dealer's good will or established clientele?

After the pertinent procedures, the case was taken under advisement on September 3, 1987.

## II

We are construing an item of Puerto Rican Law that could determine the outcome of the case and we have the benefit of an excellent statement of all the relevant facts, as adjudicated and distilled by the original federal forum, prepared for us by the Court of Appeals for the First Circuit.

In *Pan Ame. Comp. Corp. v. Data Gen. Corp.*, *supra* at 784–785, we stated the essential aspects of the historical and regulatory roots of the interjurisdictional certification procedure in Puerto Rico. We recognized that "[c]ertification is the most direct, speedy, and inexpensive way for a federal court to obtain an authoritative interpretation of state law." We reaffirm those statements today.

The procedure established in Rule 53.1 of the Rules of Civil Procedure, and Rule 27 of our Regulations have paved the way for a useful collaboration between the local and federal jurisdictions. Several factors have triggered off these developments. On the one hand, they are the result of changes in the adjudicative approach of our Supreme Court. We have recognized the prevalence of civil law rules in the solution of private law disputes. This was not always the case. *Valle v. American International Insurance Co.*, 108 D.P.R. 692 (1979). Consequently, federal courts—specially appellate forums—have become more sensible, respectful and prudent in the construction and adjudication of Puerto Rican law. See, Breyer, Stephen, *The Relationship Between the Federal Courts and the Puerto Rico Legal System*, LIII Rev. Jur. U.P.R. 307 (1984); *Reyes–Cardona v. J.C. Penney Co., Inc.*, 694 F.2d 894, 896–897 (1982); Arroyo Dávila, Mario, *Federal Court Certification Revisited*, 45 Rev.Col. Abo.P.R. 58 (1984).

The certification process is a valuable tool used by the federal forum to seek a direct interpretation of Puerto Rican law when we have no clear-cut precedents to settle the controversy pending in that jurisdiction. Since both forums are aware of the historical and legal peculiarities that distinguish us, as well as of the historical and legal ties that bring us together, this procedure becomes, specially in our case, an adequate mechanism for easing and smoothing any differences that may arise between federal and Puerto Rican courts. *Pan Ame. Corp. v. Data Gen. Corp., supra* 785; *Lehman Brothers v. Schein,* 416 U.S. 386, 391 (1974); Note, *Interjurisdictional Certification: Beyond Abstention Toward Cooperative Judicial Federation,* 111 U.Pa.L.Rev. 344 (1963).

The adjudicative framework having been clarified, we proceed to answer the certified question.

### III

We have dealt in the past with several controversies involving Act No. 75 where we have extensively examined its background and development and pinpointed its underlying purpose. We have almost invariably cited the following excerpt taken from its statement of motives:

> The Commonwealth of Puerto Rico cannot remain indifferent to the growing number of cases in which domestic and foreign enterprises, without just cause, eliminate their dealers, concessionaries, or agents, as soon as these have created a favorable market and without taking into account their legitimate interests.
>
> The Legislative Assembly of Puerto Rico declares that the reasonable stability in the dealer's relationship in Puerto Rico is vital to the general economy of the country, to the public interest and to the general welfare, and in the exercise of its police power, it deems it necessary to regulate, insofar as pertinent, the field of said relationship, so as to avoid the abuse caused by certain practices. 18 *Diario de Sesiones* 1531 (1964).

We have also cited the legislative reports that preceded its approval:

The problem of the dealership system in Puerto Rico has worsened as of late because of the ill-timed action of domestic and foreign manufacturers who, without just cause, terminate their relationship with their representatives and agents in Puerto Rico as soon as the latter have created a favorable market for their products, thus frustrating the legitimate expectations and interests of those who so efficiently carried out their responsibilities.

.  .  .  .  .

The traditional provisions which regulate contracts between parties have shown their inefficacy in protecting the legitimate rights of the representative or agent, making it thus necessary to legislate in order to regulate this relationship and guarantee that manufacturers act in good faith, fairly, and not in an arbitrary manner, and to safeguard the rights and justified expectation of the representatives and agents inherent to the relationship. Furthermore, this will consequently stabilize the dealership relationships.

This is the serious situation that we intend to remedy with the approval of this project.... *Diario de Sesiones supra* at 1531.

See *Roberto, Inc. v. Oxford Industries, Inc.,* 121 D.P.R. ___ (1988); *Marina Ind., Inc. v. Brown Boveri Corp.,* 114 D.P.R. 64 (1983).

Bearing this intent in mind, we have repeatedly held that "Act No. 75 unquestionably represents a strong public policy directed to level[ing] the contractual conditions between two groups financially unequal in their strength." *Walborg Corp. v. Tribunal Superior,* 104 D.P.R. 184, 189 (1975). In order to achieve reasonably stable dealership relationships in Puerto Rico —an important aspect of our island's economy—the lawmaker sought to level, whenever possible, the bargaining power between the manufacturer and the dealer. *Marina Ind., Inc., supra* at 85; *San Juan Merc. v. Canadian Transport Co.,* 108 D.P.R. 211, 216 (1978). See also Serota, *Constitutional Obstacles to State "Good*

*Cause" Restrictions on Franchise Terminations,* 74 Columb.L.Rev. 1487 (1974).

Act No. 75, in its basic structure, is considered a "prototype" among those that have governed worldwide the relationship between manufacturer and dealer during the last ten years. See Saltoun & Spudis, *International Distribution and Sales Agency Agreements: Practical Guidelines for U.S. Exporters,* 38 Bus.Law. 883, 885 (1983).[1] However, the lawmaker's foresight is not always absolute. As it has been correctly pointed out, "shortly after the first steps were taken to enforce Act 75 through the courts, it was evident that it had some flaws that had to be corrected...." *Cámara de Comercio de Puerto Rico Estudio sobre la Ley 75* 14 (1976). The Legislature had to amend the Act along the way to adjust it to the realities and needs of this special commercialization regime, and thus overcome certain inconveniences flawing the original text. *Id.* at 14 *et seq.* Also, in view of the lawmaker's silence in other sensitive aspects of this scheme, on occasions this Court has had to put some contents into the statute.

Thus, for example, in *J. Soler Motors v. Kaiser Jeep Int'l,* 108 D.P.R. 134 (1978), we held that Act No. 75 does not require exclusivity in the distribution of a product or delivery of a service, reason why this Act does not bar a change of middleman. Besides, in *San Juan Merc. v. Canadian Transport Co.,* 108 D.P.R. 211 (1978), we held that Act No. 75 did not apply to all agents. In *Marina Industrial Inc., supra,* we held that the statute's damage formula is not mechanic; and, recently, in *Pacheco v. National Western Life Ins. Co.,* 121 D.P.R. ___ (1988), we ruled that the gaps in Act No. 75 as to the tolling of the statute of limitations must be filled with the Commerce Code and not with the Civil Code.

The present controversy poses the following question: was the lawmaker's intent to apply Act No. 75 to a principal who withdraws in good faith from the Puerto Rican market? Or, does the withdrawal in good faith from the market constitute "just cause" for terminating the relationship?

In principle, Act No. 75 does not contemplate this aspect of the principal-agent relationship.[2] Salamone, Paul, *Puerto Rico's Distributor's Law: Law 75: A Primer,* 18 Rev.Jur.U.I.A. 67, 70, n. 10 (1983). The definition of "just cause" contained in the statute points only to the acts chargeable on the dealers.[3] The ups and downs of the principal play no part in the termination of the contractual relation. Save for rare exceptions, the situation is the same in other

---

**1.** See also: Faruki, *The Defense of Terminated Dealer Litigation: A Survey of Legal and Strategic Considerations,* 46 Ohio St.L.J. 925 (1985); Findelstein, *Legislative and Judicial Regulation of Exclusive Distribution Agreements in France,* 15 Int'l Law. 539 (1981); Antonetti, *Puerto Rico's Dealer's Act Fourteen Years Later,* 83 Com.L.J. 453 (1978); Meyer, *Terminating Sales Arrangements in West Germany,* 7 Tex. Int'l L.J. 233 (1972); Simons, *Termination of Sales Agents and Distributors in Belgium,* 17 Int'l Law. 752 (1983); Cartwright, *The New Saudi Commercial Agencies Regulation,* 16 Int'l Law. 443 (1982).

**2.** In *Marina Industrial, supra,* at 86, appellant Brown Boveri raised the unconstitutionality of Act No. 75 because it did not accept other motives for termination of contract, such as: "a) the principal's good faith, b) his right to establish his own dealership system, c) make adjustments to the dealership system which it in good faith deems necessary to increase its market, and d) *its decision to completely leave the area where it operated."* (Underscore supplied.) However, this Court did not consider this ratio-

nale because appellant Brown Boveri did not allege any of those motives for terminating the contract, reason why it lacked legal standing to attack the constitutionality of the statute. *Id.* at 86.

**3.** Article 2 of the Act provides:

"Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause." (10 L.P.R.A. § 278a)

Article 1(d) defines the term "just cause" as follows:

"(d) Just cause: nonperformance of any of the essential obligations of the dealer's contract, on the part of the dealer, or any action or omission on his part that adversely and substantially affects the interests of the principal or grantor in promoting the marketing or distribution of the merchandise or service. (10 L.P.R.A. § 278(d).)

state jurisdictions.[4]

This legislative trend has been the object of recent criticism and discussion. Hurwitz, Ann, *Franchise Market Withdrawal: "Good Cause" for Termination?*, 7 Franchise L.J. 3 (Fall 1987). It has also triggered case law reactions—restating the just cause concept—geared to overcoming the difficulties these statutes would run into if construed in such a way that principles would be subjected to live in perpetual symbiosis with the distributors under all types of circumstances. See, *Remus v. Amoco Oil Co.*, 794 F.2d 1238 (1986); *Lee Beverage Co. v. I.S.C. Wines of California*, 623 F.Supp. 867 (1985); *St. Joseph Equipment v. Massey–Ferguson, Inc.*, 546 F.Supp. 1245 (1982); *Designs in Medicine, Inc. v. Xomed, Inc.* 522 F.Supp. 1054 (1981); *Consumer Oil Corp. of Trenton, N.J. v. Phillips Petro. Co.*, 488 F.2d 816 (1973). *Cf. Kealy Pharmacy & Home Care Serv. v. Walgreen Co.*, 539 F.Supp. 1357 (1982).

An examination of the principles that shape the contractual figure at issue allows us, also in the case of Act No. 75, to devise armonic ways of overcoming any constitutional flaw in the statute.

### IV

The distribution contract is what the doctrine typically calls a continuing contract. It is largely inspired in the principle of trust. When a principal or franchisor executes this type of contract, he does so taking into account the franchisee's professional and financial qualities, his knowledge of the market, his commercial capacity and his credit. It is an agreement *intuitu personae*. *J. Soler Motors v. Kaiser Jeep Int'l, supra* at 142; III–1 Garrigues, *Tratado de Derecho Mercantil* 536 (1983); I Cano Rico, *Manual Práctico de Contratación Mercantil* 376, Madrid, Tecnos (1985).

The principal-dealer relationship is one of collaboration in the distribution and sale of a product. They are not connected by any dependency agreement or relationship subordinating one enterprise to the other. Braun, *Policy Issues of Franchising*, 14 Sw.U.L.Rev. 155, 221 (1984). Each entrepreneur operates his own enterprise on his own behalf, assumes his own risks and pursues his own profit. Puente Muñoz, *El contrato de concesión mercantil* 25, Madrid, Editorial Montecorvo (1976). Rodrigo, *Derecho Mercantil* 543 (1976).

Morever, from a financial point of view, the franchisor and the franchisee are bonded by the success or failure of the commercialization of the product. The doctrine has correctly pointed out that a dealership is like a partnership: "a sales partnership." Puente Muñoz, *op. cit.*, at 40. Such relationship is not exhausted in a single purchase and sale; rather, during the same, whatever purchase and sales contracts as are necessary will be executed in order to meet the resale needs of the dealer or franchisee.

For the principal, the dealership is but a means of planning the sale of its goods. In some cases, he agrees not to sell products similar to those franchised to any other reseller within an exclusive sales zone. On the other hand, the dealer is characterized as an "independent mercantile entrepreneur who has set up a continuing, fixed, or indeterminate relationship with another principal entrepreneur for the distribution of a product or service. This relationship is characterized by the cooperation, stability, and mutual trust it generates." See, *Roberto, Inc. v. Oxford Industries, supra*. In this sense, the commercial risk it assumes outweighs the commercial risk issuing from a simple commission clause.

In harmony with those basic principles recognized by our case law, it is easy to see how distribution contracts—usually of long duration—require that both principal and dealer be free to change or bargain in good faith the prices and credit terms for the sale of the franchised products. This is

---

**4.** However, see, in California, *Cal. Franchise Relations Act*, Cal.Bus. & Prof.Code, § 20025, where the principal's withdrawal from the geographic zone franchised is a reason for not renewing the franchise contract. See also the same reason for franchise termination in the *Petroleum Marketing Practices Act*, 15 U.S.C. § 2804 (West Supp.1979).

what happened in the case at bar. It was because of a lack of understanding in the negotiations that Country Pride decided to withdraw from the Puerto Rican market. As the Court of Appeals correctly stated, the issue is whether a principal in this situation would be compelled by Act No. 75 to choose between these two alternatives: a) accepting the prices and credit terms of his dealer; or b) terminating the agreement or contract and paying a large compensation.

As we said above, Act No. 75 was designed to give dealers vis-à-vis manufacturers, the necessary bargaining power mechanism to discuss distribution changes. We can also see the lawmaker's specific intent of affording a remedy when the principal terminates the dealership without just cause and sets up in Puerto Rico facilities for the direct distribution of goods or delivery of service previously franchised to the dealer, thus reaping the market (clientele) created by the former. *San Juan Merc. v. Canadian Transport Co., supra* at 215–216.

We must respect the lawmaker's statement as to the social evils he wanted to root out. That is why an in-depth examination of Act No. 75, its history, sources, and raison d'être, move us to conclude that the legislative intent was not to turn dealerships into interminable relationships, first of all because such legislative option would raise serious constitutional objections; and, second, because, as we said above, principal and dealer have no opposed interests. Neither is there a bond between them, created either by agreement or by a relation of dependency, subordinating one enterprise to the other. We cannot possibly construe the statute in such a way that the dealer would govern—by imposing his conditions —the principal's sales policies, or viceversa, with the inevitable loss of the financial and legal autonomy of both. Such interpretation would be contrary to public order because it would place an unreasonable restriction on man's free will.

Now then, reasons of equity require that the withdrawal be conditioned so as to prevent any arbitrariness from the withdrawing party. Scientific doctrine is in agreement as to the fact that "in any case, the termination of the contract should be done in good faith,[5] must be timely done, with due previous notice as per the nature of the franchise and the characteristics of the franchise." Puente Muñoz, op. cit., at 173. (Underscore supplied.)

The previous notice term must allow the franchisee "to be notified with enough time about the franchiser's intention to change the mercantile relationship ..." *Id.*, at 175. In short, the idea is that the dealer may timely alleviate the effects of the break-up and make arrangements for his future as entrepreneur. When the withdrawal from the market responds to a difference between the parties as to an essential element of the contract, the reasonableness of the term will depend on, among other circumstances, the duration and intensity of their negotiations of the terms in conflict.

European case law standards on the previous notice term come in handy here. Said term will depend on the more or less close relationship between the franchisor and franchisee. The less the product lines a dealer represents, the heavier his dependency on each line. If the franchisee created his enterprise with the sole purpose of selling the goods of the withdrawing franchise, the termination of the contract may entail the disappearance of his commercial activity. *A contrario sensu*, the termination of a contract that represents only a small fraction of the dealer's business will not seriously off-balance his operations.[6]

---

**5.** When the principal or franchisor uses subterfuges or fraud for sending or causing the sending of his merchandise to Puerto Rico through indirect means, or withdraws from the geographical zone as a pretext to walk around the statutory remedy, which circumstances are not present in this case, the doctrine affords the dealer a right to compensation under different premises that we need not discuss here.

**6.** The dealer is the one who is acquainted with his geographical market, and is in contact with the retailers and consumers; in other words, the clientele is his. The franchisee is not barred from offering his services and grasp of the market to a new franchisor when the contractual relation ends.

On the other hand, we must take into consideration the age of the ties broken by the dealer, the market conditions of the specific commercial sector, and his relationship with other suppliers and with the clientele of the withdrawing product. In short, according to the doctrine, the franchisor must observe the previous notice term that would have been foreseen by an entrepreneur acting diligently and in good faith. *Id.*, at 174.

In the light of the foregoing, we answer the certified question as follows: Act No. 75 of June 24, 1964, does not bar the principal from totally withdrawing from the Puerto Rican market when his action is not aimed at reaping the good will or clientele established by the dealer, and when such withdrawal—which constitutes just cause for terminating the relationship—is due to the fact that the parties have bargained in good faith but have not been able to reach an agreement as to price, credit, or some other essential element of the dealership. In any case, said withdrawal must be preceded by a previous notice term which shall depend on the nature of the franchise, the characteristics of the dealer, and the nature of the pre-termination negotiations.

Judgment will be rendered accordingly.

## JUDGMENT

For the reasons set forth in the foregoing opinion, which is made a part of these presents, we hereby certify that Act No. 75 of June 24, 1964 does not bar the principal from totally withdrawing from the Puerto Rican market when his action is not aimed at reaping the good will or clientele established by the dealer, and when such withdrawal—which constitutes just cause for terminating the relationship—is due to the fact that the parties have bargained in good faith but have not been able to reach an agreement as to price, credit, or

some other essential element of the dealership. In any case, said withdrawal must be preceded by a previous notice term which shall depend on the nature of the franchise, the characteristics of the dealer, and the nature of the pre-termination negotiations.

It was so decreed and ordered by the Court and certified by the Chief Clerk. Mr. Justice Ortiz would answer the certified question in the negative because he deems that Act No. 75 does not cover the principal's unilateral and total withdrawal from the market when he does not try to reap the good will and established clientele. The text and legislative history of Act No. 75 clearly show that it applies when the principal terminates a contract for changing the dealership either for selling directly or through agents on commission, or through one or more new dealers. The Act cannot have the intent of limiting the commercial decision of withdrawing completely from the Puerto Rican market. In these cases, there is no reason to ask for, nor is there, any remedy under Act No. 75, reason why it is unnecessary and irrelevant to discuss whether or not there was just cause for terminating the contract. Mr. Justice Negrón García disqualified himself. Mr. Justice Rebollo López and Mrs. Justice Naveira de Rodón took no part in this decision.

/s/ Bruno Cortés Trigo
Bruno Cortés Trigo
Chief Clerk

CERTIFICO que la anterior.es copia fiel y exacta de su original. San Juan, P. R. *26* de *julio* de 19*88*.

SECRETARIO GENERAL
TRIBUNAL SUPREMO DE PUERTO RICO

Por *Margarita Grau Gay*
Subsecretario