May 9, 1994 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-2089

VULCAN TOOLS OF PUERTO RICO,

Plaintiff, Appellant,

v.

MAKITA USA, INC.,

Defendant, Appellee.

ERRATA SHEET

The opinion of this court issued on May 4, 1994, is amended

as follows:

Page 4, lines 6-7: Delete "Because Makita's motion for
summary judgment was not filed until August 3, 1993,"

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-2089

VULCAN TOOLS OF PUERTO RICO,

Plaintiff, Appellant,

v.

MAKITA USA, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Raymond L. Acosta, U.S. District Judge]

Before

Selya, Circuit Judge,

Bownes, Senior Circuit Judge,

and Stahl, Circuit Judge.

Wilfredo A. G igel, with whom Law Offices of Wilfredo A. G igel

was on brief for appellant.
Arturo J. Garcia-Sola, with whom Manuel Fernandez-Bared and

McConnell, Valdes were on brief for appellee.

May 4, 1994

BOWNES, Senior Circuit Judge. Does the Dealers'
BOWNES, Senior Circuit Judge.

Act of Puerto Rico, Act 75 of June 24, 1964, P.R. Laws Ann.

tit. 10, 278-278d (1976 & Supp. 1989) ("Law 75" or the

"Act"), come into play where the sales or market share of a

non-exclusive distributor decline after its supplier

establishes additional non-exclusive distributors for its

products in Puerto Rico? Because we answer this question in

the negative, we affirm the district court's grant of summary

judgment for the defendant.

I.

BACKGROUND

The following facts are undisputed. Plaintiff-

appellant, Vulcan Tools of Puerto Rico, Inc., sells and

services power tools manufactured by a Japanese company,

Makita Corp. Vulcan has distributed Makita products since

May 1983, when it entered into a non-exclusive distribution

contract with defendant-appellee, Makita U.S.A., Inc.

("Makita"), a subsidiary of its Japanese parent.

At the time Vulcan became a non-exclusive

distributor for Makita, the latter already had three other

non-exclusive distributors operating in Puerto Rico. In 1988

Makita appointed a sales representative in Puerto Rico and

authorized thirty-four additional non-exclusive

distributorships on the island. Vulcan continued to sell and

service Makita tools. While the sale of Makita products in

-2-
2

Puerto Rico has more than tripled since 1988, Vulcan's total

sales of the same and its market share have fallen.

In February 1989 Vulcan filed this action in the

United States District Court for the District of Puerto Rico

alleging that Makita had impaired the existing relationship

between the parties without just cause in violation of Law

75. The district court granted summary judgment in favor of

Makita. This appeal ensued.

II.

DISCUSSION

On appeal Vulcan argues (1) that the district court

abused its discretion in entertaining Makita's motion for

summary judgment, and (2) that summary judgment was

improvidently granted because whether Makita's hiring of

thirty-four additional distributors in Puerto Rico impaired

Makita's established relationship with Vulcan is a disputed

question of material fact.1

1. In the complaint, Vulcan also alleged that Makita
violated Law 75 by (1) appointing a sales representative in
Puerto Rico and (2) allowing the importation into Puerto Rico
of Makita power tools that did not meet the requirements
of the Occupational Safety and Health Act ("OSHA"). Vulcan
did not, with respect to the former claim, contest summary
judgment below, and has not pressed either of the claims on
this court. Consequently, they have been waived on appeal.
Gamma Audio & Video, Inc. v. Ean-Chea, 11 F.3d 1106, 1113

(1st Cir. 1993) (issues that surface for the first time on
appeal or are raised in a perfunctory manner on appeal are
deemed waived).

-3-
3

A. Timeliness of Makita's Summary Judgment Motion

On November 4, 1991 the Magistrate Judge assigned

to the case issued a "Final Pretrial Conference Report" which

established December 15, 1991 as the date for completing

outstanding discovery, and December 30 as the deadline for

filing dispositive motions. Vulcan argues on appeal the same

argument rejected below: that because Makita's motion for

summary judgment was not filed until August 3, 1993, the

motion was untimely, and the district court was barred from

considering it under Fed. R. Civ. P. 16(b) and 16(e).2

Because trial judges must be able to control the

management of their cases, we review a district court's

decision to modify a pretrial scheduling order under an abuse

of discretion standard. See Anda v. Ralston Purina, Co., 959

F.2d 1149, 1155 (1st Cir. 1992); In re San Juan Dupont Plaza

Hotel Fire Litigation, 859 F.2d 1007, 1020 (1st Cir. 1988);

see also Ramirez Pomales v. Becton Dickinson & Co., 839 F.2d

1, 3 (1st Cir. 1988) (decision to modify a pretrial order is

subject to the trial court's discretion). Moreover, pretrial

orders are to be liberally construed, James W.M. Moore, et

2. Rule 16(b) instructs district courts to enter scheduling
orders limiting the time to, inter alia, file motions and

complete discovery. Under this rule, "[a] schedule shall not
be modified except upon a showing of good cause and by leave
of the district judge or, when authorized by local rule, by a
magistrate judge." Rule 16(e) provides, in pertinent part,
that once a pretrial order is entered, it "controls the
subsequent course of the action, unless modified by a
subsequent order."

-4-
4

al., Moore's Federal Practice, 16.19, at 16-90 (2d ed.

1993) (citing cases). Thus we are loathe to upset a district

court's interpretation of its own order. See Martha's

Vineyard Scuba HQ. v. Unidentified Vessel, 833 F.2d 1059,

1066-67 (1st Cir. 1987) (citing cases) (recognizing "the

special role played by the writing judge in elucidating the

meaning and intendment of an order which he authored").

The district court determined that the deadline for

filing dispositive motions established in the magistrate's

order was vacated by a subsequent order issued by the court

in which no such deadline was set, and that Makita's motion

was therefore not untimely. The sequence of events is as

follows. In March 1992 Vulcan moved to have a trial date

set. Makita objected on the ground that the case was not

ready for trial, in part, because Vulcan had not responded to

various document requests and the deposition of Vulcan's

President, Joseph Fayer, had not yet concluded. On April 27,

1992, in response to Makita's objections, the district court

granted Vulcan additional time to produce specified

documents, set deadlines for various depositions, ordered

that discovery be completed by June 30, 1992, and referred

the case to the magistrate judge for the scheduling of

another pretrial conference. The court further instructed

the parties to submit a revised proposed final pretrial

order.

-5-
5

The parties submitted a proposed final pretrial

order in August 1992, which was approved by the court six

days later. Neither that order nor the April 27 order, set a

deadline for filing dispositive motions. The district court

viewed its decision to reopen discovery as vitiating the

existing deadline for the filing of dispositive motions.

Vulcan Tools of Puerto Rico, Inc. v. Makita U.S.A., Inc., No.

89-148, slip op. at 6 (D.P.R. Sept. 1, 1993). Because the

original cut-off date for filing dispositive motions fell

after the original discovery deadline, the court's finding

that a change in the latter necessarily abolished the former

is eminently reasonable. While it is true that Makita did

not specifically request an extension of time for filing a

motion for summary judgment, the court could have concluded

that the "good cause" Makita demonstrated for extending the

discovery deadline was also good cause for lifting the

deadline for filing dispositive motions. We find no abuse of

discretion in the court's decision to consider Makita's

motion for summary judgment.

B. Law 75

We now turn to the principal issue raised on

appeal. Vulcan argues that summary judgment was

inappropriate because whether Makita's appointment of thirty-

four additional distributors caused a "detriment" to Vulcan

(i.e., the subsequent decline in Vulcan's sales and market

-6-
6

share with respect to Makita products), is a question of fact

for the jury. Vulcan apparently concedes that, under the

parties' contract, Makita was entitled to name additional

non-exclusive distributors at will, so long as it did not

violate Law 75.

We say "apparently," because Vulcan has sent out

mixed messages. Although it has made the above concession

both in its brief, Appellant's Brief at 21, and in oral

argument, at times during oral argument Vulcan maintained

that, as part of its distribution contract, Makita agreed to

limit the number of Makita distributors in Puerto Rico to

three. Even if this argument has been properly preserved by

Vulcan, it is without merit.

The terms of Vulcan's non-exclusive distributorship

are set forth in a May 26, 1993 letter from Carl Schwinne,

Makita's marketing manager, to Joseph Fayer, Vulcan's

president. The letter states: "This letter will summarize

our phone conversation today regarding a non-exclusive

distributorship for Makita power tools in Puerto Rico." The

letter also contains information about Makita's tool order

program, payment terms, stock adjustments, Makita's

advertising program, and warranty repairs. Vulcan never

objected to the contractual terms set forth in the May 26

letter. Vulcan's argument that Makita agreed not to have

more than three other distributors in Puerto Rico is based on

-7-
7

a conversation that took place on May 18 between Fayer and

Frank Isaacs, then Makita's regional sales manager. As

evidence of such limitations, Vulcan offered Isaacs'

deposition, at which Isaacs testified as follows:

Q. All right. Getting back to the
agreement with Vulcan, as for
the setting up of the
distributorship, did you or
anyone at Makita, to the best
of your knowledge and
recollection, ever indicate to
Mr. Fayer that Makita would
operate through only two or
three distributors in the
market.

A. Yes. I stated that right up
front that we -- on our visit
to him -- went and said these
are the people -- These are the
channels of distribution that
we're looking at. These are
the distributors that we're
going to try to sell to
accomplish our objective in
this market, and if -- and we
told this to each one. If you
support our programs, grow our
business here, in an acceptable
rate, whatever that might be,
then we see no reason to pursue
any other distributors in these
channels.

Q. At that time they didn't see a
need for that?

A. That's right.

Q. But that could change?

A. Sure it can.

Q. And the company wanted to make
sure that it retained the right

-8-
8

to name others, other
distributors?

A. Sure. You always retain that
right, but if you change your
strategy in the marketplace,
you need to let your
distributors know what that is.

Isaacs' Deposition at 71-72.

The law of Puerto Rico is clear that no oral

extrinsic evidence may be admitted to add to, alter or modify

a written agreement except when fraud or surprise is alleged.

P.R. Laws Ann. tit. 32, App. IV, R. 69(B) (1983) (Parole

Evidence Rule).3 When an agreement leaves no doubt as to

the intention of the parties, a court should not look beyond

the literal terms of the contract. Marina Ind. Inc. v. Brown

Boveri Corp., 114 P.R. Dec. 64, 72 (1983) (Official

Translation); Catullo v. Metzner, 834 F.2d 1075, 1079 (1st

Cir. 1987). This principle is embodied in Article 1233 of

the Puerto Rico Civil Code, which applies to the contract

3. We have recognized that,

[i]n spite of the general applicability
of the Federal Rules of Evidence to
diversity actions, it is well recognized
that Congress did not intend the rules to
preempt so-called "substantive" state
rules of evidence such as the parole
evidence rule . . . . Although the
application of these rules will affect
the admissibility of certain evidence,
they in reality serve substantive state
policies regulating private transactions.

McInnis v. A.M.F., Inc., 765 F.2d 240, 245 (1st Cir. 1985).

-9-
9

between Vulcan and Makita4 and determines how courts should

interpret a contract where there is a conflict over its

meaning:

If the terms of a contract are clear and
leave no doubt as to the intentions of
the contracting parties, the literal
sense of its stipulations shall be
observed. If the words should appear
contrary to the evident intention of the
contracting parties, the intention shall
prevail.

P.R. Laws Ann. tit. 31, 3741 (1990). "For Article 1233

purposes, a term is considered `clear' when it is

sufficiently lucid to be understood to have one particular

meaning, without room for doubt." Hopgood v. Merrill Lynch,

Pierce, Fenner & Smith, 839 F. Supp. 98, 104 (D.P.R. 1993)

(citations omitted). If the meaning of a contract's terms is

sufficiently clear, "the court cannot dwell on the `alleged'

intent of the parties at the time they entered into the

contract." Id.

There is no doubt that the meaning of the word

"non-exclusive," used in the letter of May 26, is clear and

unambiguous. Makita named Vulcan as a non-exclusive

4. The contract between Vulcan and Makita is a commercial
contract, and is thereby regulated by the relevant provisions
of the Commerce Code of Puerto Rico, P.R. Laws Ann. tit. 10,
1301-1314 (1976). Where, as is the case here, the
Commerce Code does not provide the solution to a question of
contractual interpretation, courts must look to the Civil
Code and the common law to fill the gaps. See P.R. Laws Ann.

tit. 10, 1301 (1976); General Office Products Corp. v.

Gussco Mfg., Inc., 666 F. Supp. 328, 331 (D.P.R. 1987).

-10-
10

distributor, and thereby expressly retained the right to name

additional non-exclusive distributors at its discretion.

Therefore, we need not dwell on the import of Isaacs'

testimony, and the alleged promise by Makita that it would

limit its distributors in Puerto Rico to three. We move on

and address Law 75 directly.

On June 24, 1964, Law 75 became effective. It

prohibited "the termination by the principal . . . of the

relationship derived from a dealer's contract or the refusal

to renew said contract on its normal expiration, except for

just cause, this, notwithstanding the existence of a clause

in the contract reserving to the parties the unilateral right

to terminate the existing relationship." United Medical

Equipment Corp. v. S. Blickman, Inc., 260 F. Supp. 912, 913

(D.P.R. 1966); see P.R. Laws Ann. tit. 10, 278a (1964)

(amended 1966). Law 75 was enacted in order to protect the

interests of commercial distributors operating in Puerto Rico

"from the harm caused when a supplier arbitrarily terminates

a distributorship once the dealer has created a favorable

market for the supplier's product." R.W. Int'l Corp. v.

Welch Food, Inc., 13 F.3d 478, 482 (1st Cir. 1994); see also

Medina & Medina v. Country Pride Foods, Ltd., 858 F.2d 817,

820 (1st Cir. 1988) (reproduction of official translation of

Puerto Rico Supreme Court's response to certification

question, 122 P.R. Dec. 172 (1988)); Warner Lambert Co. v.

-11-
11

Superior Court of Puerto Rico, 101 P.R. Dec. 378 (1973)

(Official Translation).

The statement of motives behind Law 75 issued by

thePuerto RicoHouse Committeeon Commerceand Industryis clear:

The Commonwealth of Puerto Rico
cannot remain indifferent to the growing
number of cases in which domestic and
foreign enterprises, without just cause,
eliminate their dealers . . . or without
fully eliminating them, such enterprises
gradually reduce and impair the extent of
their previously established
relationships, as soon as these have
created a favorable market and without
taking into account their legitimate
interests.

Statement of Motives of Act 75, 1964 P.R. Laws, 4th Reg.Sess.

231. Because the legislature of Puerto Rico considered

traditional principles of contract law insufficient to

protect the rights of dealers, it passed Law 75 to safeguard

these rights and stabilize dealership relationships. Medina

& Medina, 858 F.2d at 820.

In 1966, the Dealers' Act was amended, and assumed

its present form:

Notwithstanding the existence in a
dealer's contract of a clause reserving
to the parties the unilateral right to
terminate the existing relationship, no
principal or grantor may terminate said
relationship or directly or indirectly

carry out any act detrimental to the

existing relationship or refuse to renew

said contract on its normal expiration,
except for just cause.

-12-
12

P.R. Laws Ann. tit. 10, 278a (1976). The underlined

language was added by the amendment. The 1966 amendment was

intended to cover cases where the principal impairs the

distributor's contractually acquired rights. General Office

Products v. Gussco, 666 F. Supp. at 331 ("Gussco") (citing W.

Colon & R. Colon, El Contrato de Distribucion o de Agencia

Comercial, 27 Revista de Derecho Puertorriqueno 225 (1968)).

Gussco involved a claim under Law 75 by the exclusive Puerto

Rico distributor of its supplier's office products. The

plaintiff alleged that its supplier violated Law 75 by its

passivity in the face of a decision by a state-side

distributor to enter the Puerto Rican market. The court

found "that the 1966 amendment adding the impairment-of-

contract cause of action [covers] this type of parallel

market distributorship in contravention of a voluntarily

established exclusive contract." Id.; see also A. Estrella,

The Dealer's Contractual or Commercial Distributorship:

Nature of the Relationship, Termination of the Contract, 31

Revista de Colegio de Abogados de Puerto Rico 241, 251 (1967)

(a distributor has a cause of action under Law 75 when its

supplier establishes additional distribution contracts after

having entered into an exclusive one) (cited in Gussco, 666

F. Supp. at 333). We must determine whether the 1966

amendment covers Vulcan's claim.

-13-
13

In order to focus our inquiry, we illustrate

Vulcan's argument with the following syllogism: (1) Makita

established additional non-exclusive distributorships in

Puerto Rico; (2) subsequently Vulcan's sales of Makita tools

and its share of the Makita market fell; therefore (3) Vulcan

is entitled to a jury trial to determine whether (1) caused

(2). This argument is premised upon Vulcan's assumption that

if (1) caused (2), then there has been a "detriment" to the

parties' "established relationship," and Makita is liable

under Law 75 absent a showing of just cause for its actions.

For the reasons set forth below, we disagree with Vulcan's

assumption.

It is beyond cavil that non-exclusive distributors

are entitled to protection under Law 75. J. Soler Motors v.

Kaiser Jeep Int'l, 108 P.R. Dec. 134, 146 (1978) (Official

Translation). It is equally true, however, that Law 75 does

not operate to convert non-exclusive distribution contracts

into exclusive distribution contracts. See Gussco, 666 F.

Supp. at 331 ("The law imposes no prohibition upon the

principle of selling or establishing parallel distributorship

agreements if he so reserves the right to do so."); see also

Nike Int'l, Ltd. v. Athletic Sales, Inc., 689 F. Supp. 1235,

1238 (D.P.R. 1988) ("[T]he legislature [of Puerto Rico] did

not intend that Law 75 be a safe haven for dealers to avoid

-14-
14

the express terms of the contracts to which they willingly

subscribe.").

The basic flaw in Vulcan's position emanates from

its expansive reading of the phrase "detriment to the

established relationship." According to Vulcan, every

diminution in the sales or the market share of a non-

exclusive distributor attributable to a business decision by

its supplier constitutes such a "detriment," and is

actionable under Law 75. This spin on Law 75 is

unprecedented, and wholly unsupported by any legal authority.

Not only would Vulcan's interpretation of the Act grant

virtual monopoly status to every supplier's first non-

exclusive distributor in Puerto Rico, it would effectively

prevent suppliers from raising prices, even when such a right

is secured by contract, where doing so would cut into the

distributor's sales or profits. This view of Law 75 has

already been rejected by the Supreme Court of Puerto Rico.

See J. Soler Motors, 108 P.R. Dec. at 150 (Official

Translation) (manufacturer-imposed increase in price of motor

vehicles does not give rise to a Law 75 violation where

manufacturer reserved right to do so in distribution

agreement); see also Medina & Medina, 858 F.2d at 823

(declining to construe Law 75 in such a way that a dealer

could govern its principal's policies resulting in

principal's loss of legal and financial autonomy).

-15-
15

As we explained above, the "established

relationship" between dealer and principal is bounded by the

distribution agreement, and therefore the Act only protects

against detriments to contractually acquired rights. Gussco,

666 F. Supp. at 331. The text of Law 75 makes this point

particularly clear. The statutory language defines a

"dealer's contract" subject to Law 75 as:

A relationship established between a
dealer and a principal . . . whereby the
former actually and effectively takes
charge of the distribution of merchandise
. . . on the market of Puerto Rico.

P.R. Laws Ann. tit. 10, 278d (1976). Consistent with our

reading of the Act is the statutory presumption that a

principal has impaired the existing relationship when, inter

alia, "the principal . . . establishes a distribution

relationship with one or more additional dealers for the area

of Puerto Rico or any part of said area in conflict with the

contract existing between the parties." P.R. Laws Ann. tit.

10, 278a-1(b)(2) (Supp. 1989) (emphasis added).

The question whether there has been a "detriment"

to the existing relationship between supplier and dealer is

just another way of asking whether the terms of the contract

existing between the parties have been impaired. Here, the

contractual relationship between Vulcan and Makita was not

affected by Makita's establishment of additional non-

exclusive distributors for its products in Puerto Rico. This

-16-
16

is because Makita, in its distribution agreement with Vulcan,

expressly reserved the right to add distributors in the

Puerto Rican market. Where, as is the case here, a dealer's

contractually acquired rights have not been impaired in any

way, Law 75 does not come into play.

The judgment of the district court is Affirmed.
Affirmed.

-17-
17