UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 97-1802

EUROMOTION, INC. d/b/a PRIME WHOLESALERS,

Plaintiff, Appellant,

v.

BMW OF NORTH AMERICA, INC.,

Defendant, Appellee.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Perez-Gimenez, U.S. District Judge]



Before

Boudin, Circuit Judge,

Campbell and Bownes, Senior Circuit Judges.



Rafael Escalera-Rodriguez, with whom Edna Hernandez and
Richard & Escalera, were on brief for appellant.
Manuel A. Guzman, with whom Carlos A. Steffens and Manuel A.
Guzman Law Offices, were on brief for appellee.



February 23, 1998

CAMPBELL, Senior Circuit Judge. Euromotion, Inc.
("Euromotion") brought this diversity action against BMW of
North America, Inc. ("BMW"), alleging that BMW had terminated
Euromotion's dealership agreement without good cause in
violation of Puerto Rico's Law 75 of June 24, 1964, P.R. Laws
Ann. tit. 10, 278 et seq. ("Law 75"), and that BMW had failed
to negotiate with Euromotion in good faith concerning a
dealership, thereby violating Article 1802 of the Puerto Rico
Civil Code, P.R. Laws Ann. tit. 31, 5141. BMW moved for
summary judgment arguing, inter alia, that the undisputed facts
established that Euromotion had never been a BMW dealer, and
that BMW had never in fact negotiated with Euromotion. The
district court granted BMW's motion. We affirm the district
court's grant of summary judgment.
I. BACKGROUND.
We state the facts in the light most favorable to
Euromotion. See Casas Office Machs., Inc. v. Mita Copystar
Am., Inc., 42 F.3d 668, 684 (1st Cir. 1994). 
Beginning in 1991, Euromotion, an independent vendor
of automobiles, without encouragement from BMW, began to
perform many of the functions of a BMW dealer in Puerto Rico. 
It bought BMW automobiles from independent dealers in Florida
for resale in Puerto Rico, maintained an extensive BMW
inventory, acquired sales facilities, and advertised having BMW
automobiles for sale.
BMW had no authorized dealer of its own in Puerto
Rico, and in 1993 began to search for an establishment to serve
as its exclusive dealer there. Euromotion's president
corresponded with BMW about Euromotion's expressed desire to
become the exclusive BMW dealer in Puerto Rico. In October
1993, BMW interviewed Euromotion's president and other
potential candidates for the dealership position.
Around the same time, BMW instituted an export
prohibition on its automobiles. As a result of that
prohibition, Tom Bush BMW, an independent BMW dealer in
Florida, informed BMW and Euromotion that it would not continue
to sell cars to Euromotion.
Sometime in October or November of 1993, John
Ciontea, the area manager for BMW, met with Manuel Soltero,
Euromotion's president (the "1993 meeting"). Also present at
this meeting were Luis Rios, an automobile dealer used by
Euromotion, and Carlos Kirigin, a sales representative for a
Florida BMW dealership by the name of Fields BMW. At this
meeting, Soltero expressed concern that BMW's newly implemented
prohibition on exports would impede Euromotion's ability to
obtain BMW's cars. In response, Ciontea gave Kirigin (and
through him, Fields BMW) the "green light" to sell cars and
other paraphernalia to Euromotion. According to Euromotion,
BMW encouraged it to develop the Puerto Rican market and to
keep its inventories high. BMW also told Euromotion's
president not to worry about the lack of a written dealer
application packet because "everything would be put [i]n black
and white" eventually.
Euromotion contends that the 1993 meeting established
a dealer relationship with BMW. After the meeting, Euromotion
sold only BMW's cars and attempted to develop the Puerto Rican
market for such cars. Euromotion obtained these cars from
Fields BMW in Florida at a wholesale price. Although it is
clear from the record that BMW did not have the authority to
impose any terms or conditions on Fields BMW regarding its sale
of automobiles to Euromotion, and although these sales were
negotiated between Fields BMW and Euromotion, Fields BMW would
have charged Euromotion a higher price if the 1993 meeting had
not taken place. Euromotion also obtained brochures, T-shirts,
and other BMW-related advertising materials from Fields BMW. 
Further, the BMW-authorized service representative in Puerto
Rico gave full warranty service to cars sold by Euromotion.
The parties agree that Euromotion never bought a car
directly from BMW, never placed a purchase order with BMW,
never received any promotional material directly from BMW,
never consulted or negotiated directly with BMW the prices or
terms of its sales relationships with any of BMW's independent
dealers, and never saw a copy of BMW's dealership agreement.
On December 13, 1993, Soltero acknowledged in a
letter written to BMW that BMW had "a lot of candidates for the
[BMW dealership] franchise . . . [that] I understand you have
to evaluate." Soltero expressed the "hope that before [BMW
picked its] candidate [it] should come to Puerto Rico and give
[Euromotion] a chance to show our business, meet our great
staff and finally demonstrate why we are the best choice to
proudly represent the BMW franchise in Puerto Rico." Soltero
also asked BMW to "always remember that [Euromotion] already
control[s] the BMW market and everybody recognize[s] us as the
BMW dealer in Puerto Rico."
On June 22, 1995, BMW announced in the Puerto Rican
papers that it had chosen a company called "Autogermana" to
serve as the exclusive BMW dealer for Puerto Rico. Sometime
after Autogermana was appointed as BMW's authorized dealer in
Puerto Rico, Fields BMW ceased to give Euromotion the benefit
of advantageous prices and business terms.
On June 25, 1996, Euromotion filed the present action
alleging that BMW had violated Law 75 and the duty of good
faith and fair dealing imposed by Article 1802 of the Puerto
Rican Civil Code. Thereafter, Euromotion filed a motion for
preliminary injunctive relief under Law 75, which the court
denied after discovery and a hearing. On October 24, 1996, BMW
filed a motion for summary judgment on both of Euromotion's
claims.
On May 21, 1997, the district court allowed BMW's
summary judgment motion. On the Law 75 claim, the district
court found that Soltero's letter of December 13, 1993, wherein
he acknowledged that there were many contenders for BMW to
evaluate for a possible Puerto Rican dealership, established
conclusively that an actual dealer relationship did not then
exist as a result of the prior meeting between Ciontea and
Soltero. On the good faith claim, the court found that none of
the interactions between BMW and Euromotion constituted
negotiations. Since no negotiations took place, the court
reasoned that BMW was not under a duty to negotiate in good
faith. The court did not address BMW's statute-of-limitations
defense. On May 22, 1997, the court dismissed the case with
prejudice. Euromotion has appealed. We affirm.
II. STANDARD OF REVIEW.
We review a grant of summary judgment de novo,
viewing "the entire record in the light most hospitable to the
party opposing summary judgment, indulging all reasonable
inferences in that party's favor." Griggs-Ryan v. Smith, 904
F.2d 112, 115 (1st Cir. 1990) (citations omitted). Summary
judgment is appropriate only if "the pleadings, depositions,
answers to interrogatories, and admissions on file, together
with the affidavits, if any, show that there is no genuine
issue as to any material fact and that the moving party is
entitled to judgment as a matter of law." Fed. R. Civ. P.
56(c). 
Summary judgment is properly awarded against a party
who, "after adequate time for discovery . . . fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will
bear the burden of proof at trial." Celotex Corp. v. Catrett,
477 U.S. 317, 322 (1986). Not all disputes preclude summary
judgment, only those that relate to genuine issues of material
fact. "The evidence manifesting the dispute must be
'substantial,' going beyond the allegations of the complaint." 
Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975) (citations
omitted). Further, "neither conclusory allegations, improbable
inferences, and unsupported speculation, nor [b]rash 
conjecture coupled with earnest hope that something concrete
will materialize" prevent us from awarding summary judgment. 
J. Geils Employee Benefit Plan v. Smith Barney Shearson,
Inc., 76 F.3d 1245, 1251 (1st Cir. 1996) (internal quotation
marks and citations omitted). Rather, to prevail over a
properly supported motion for summary judgment, a nonmoving
party must establish the existence of a trial-worthy issue by
presenting "enough competent evidence to enable a finding
favorable to the nonmoving party." Goldman v. First Nat'l Bank
of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Andersonv. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).
III. DISCUSSION.
A. The Law 75 Claim.
Law 75 prohibits a principal from terminating its
business relationship with a dealer unless the principal has
"just cause." P.R. Laws Ann. tit. 10, 278a. We interpret
the language of Law 75 "in the light of the ends sought by the
statute," see Sudouest Import Sales Corp. v. Union Carbide
Corp., 732 F.2d 14, 16 (1st Cir. 1984), which are "to protect
Puerto Rico dealers from the harm caused when a supplier
arbitrarily terminates a distributorship once the dealer has
created a favorable market for the supplier's products, 'thus
frustrating the legitimate expectations and interests of those
who so efficiently carried out their responsibilities,'" R.W.
Int'l Corp. v. Welch Food, Inc., 13 F.3d 478, 482 (1st Cir.
1994) (citing Medina & Medina v. Country Pride Foods, Ltd., 858
F.2d 817, 820 (1st Cir. 1988)).
To that end, Law 75 is drafted in broad terms. Law
75 defines a dealer as a "person actually interested in a
dealer's contract." P.R. Laws Ann. tit. 10, 278(a). A
"dealer's contract" includes any business relationship
established between a dealer and a principal or grantor
whereby and irrespectively of the manner in which the
parties may call, characterize or execute such
relationship, the former actually and effectively takes
charge of the distribution of a merchandise, or the
rendering of a service, by concession or franchise, on the
market of Puerto Rico.
P.R. Laws Ann. tit. 10, 278(b).
Euromotion argues that it succeeded in raising an
issue of material fact regarding whether the 1993 meeting
created a dealer-principal relationship. Euromotion analogizes
its relationship with BMW (through Fields BMW) to the dealer
relationship in a case decided by the Puerto Rican Supreme
Court, J. Soler Motors, Inc. v. Kaiser Jeep International
Corp., 8 P.R. Offic. Trans. 138, 108 D.P.R. 134 (1978). In J.
Soler Motors, the defendant appointed the plaintiff as its
dealer in Puerto Rico, then assigned the dealership contract to
its general distributor in the area. See id. at 141. This
meant that the dealer had to place orders for cars and parts
through the general distributor. See id. Despite the presence
of this intermediary, the court applied Law 75 to cover the
dealer. See id. at 145.
We are not persuaded. In J. Soler Motors, the
plaintiff had signed a dealership contract setting out detailed
terms to govern its business relationship with the defendant. 
No such evidence appears in the present case. Euromotion
admits that it never even saw the standard dealership agreement
routinely used by BMW much less became a party to such a
contract.
Perhaps sensing the weakness in its argument,
Euromotion notes that we have defined the necessary dealer
relationship for Law 75 purposes quite generously. We have
held that a party still in the process of negotiating the final
terms of a dealer's contract may fall under the protective
aegis of Law 75 where, for some time, it had been acting de
facto as a dealer. See Welch, 13 F.3d at 486.
But Welch was an altogether different case. The
defendant in Welch had written to the plaintiff stating that it
had "reached a decision to continue the frozen food
distribution . . . in Puerto Rico by transferring [its] account
to [the plaintiff]." Id. at 480. In that same letter, the
defendant agreed to "draft an agreement" that would establish
the plaintiff as an authorized dealer. Id. Shortly
afterwards, while still in the process of negotiating the terms
of a written dealership agreement, the parties began doing
business directly with one another as if a dealer relationship
had already been formalized.
The defendant in Welch conceded that the plaintiff
was "performing the functions of a distributor within the
meaning of Law 75." Id. at 482. In the circumstances, we
stated that Law 75 "clearly incorporates within its reach any
arrangement between a supplier and dealer in which the dealer
is actually in the process of distributing the suppliers'
merchandise in Puerto Rico." Id. at 482-83.
Focusing only on the last statement quoted above,
Euromotion argues that whenever "parties are dealing, a
dealership exists for purposes of the Act," quoting Welch, 13
F.3d at 484. We made that statement, however, in a context
very different from that at bar. First, Euromotion never
reached the point here of becoming engaged in negotiations with
BMW regarding the terms of an actual dealership contract. 
Second, there is no substantial evidence that BMW ever
designated Euromotion, even informally, to act as its
authorized dealer as distinct from continuing to sell BMW cars
independently. Third, the parties in Welch directly dealt with
one another for over a year in the manner of a de facto
dealership arrangement. Although the lack of direct dealings
may not always be determinative, see J. Soler Motors, 8 P.R.
Offic. Trans. at 145, direct business relations as in Welch can
provide evidence of a dealer relationship. Fourth,
Euromotion's president wrote a letter to BMW after the dealer
relationship was supposedly established in which he
acknowledged that BMW had "a lot of candidates for the [BMW
dealership] franchise . . . [that] I understand you have to
evaluate." This letter is clearly inconsistent with
Euromotion's position that it had an understanding with BMW
that it was BMW's authorized dealer. Welch, therefore, is in
no sense dispositive.
Euromotion also argues that Law 75 allows recovery by
any dealer, such as itself, who "invest[s] time, effort, and
expense in the development of a market, . . . even where
certain other trappings of the typical dealership [are]
missing." Sudouest Import Sales Corp., 732 F.2d at 16
(citation omitted). However, unilateral efforts to sell a
product and develop a market are not sufficient, alone, to
create a dealer relationship within the purview of Law 75. SeeLneas Areas Costarricenses v. Caribbean Gen., Inc., 682 F.
Supp. 117, 121 (D.P.R. 1988) (collecting cases).
It is true that there is evidence that BMW encouraged
its independent dealer in Florida, Fields BMW, to continue its
favorable business relationship with Euromotion. At that time,
BMW may well have been pleased, and so expressed itself, by
Euromotion's efforts to sell BMW automobiles in Puerto Rico. 
However, BMW's encouragement of Euromotion to proceed at that
time as an independent seller of BMW automobiles could not
create a dealer relationship.
On this record, the only conclusion a reasonable fact
finder could reach is that Euromotion did not have a dealer
relationship within Law 75 with BMW. The absence of such a
relationship is fatal to its claim. See Welch, 13 F.3d at 483
(declaring that Law 75 "insists upon establishment of a
'supplier/dealer' relationship"). Accordingly, the district
court correctly dismissed Euromotion's Law 75 claim.
B. Duty to Negotiate in Good Faith.
The Puerto Rican Supreme Court has held that,
although parties generally may withdraw from negotiations at
any time prior to forming a contract, parties once engaged in
a negotiation process have a duty to proceed in good faith. 
See Producciones Tommy Muiz, Inc. v. COPAN, 13 P.R. Offic.
Trans. 660, 676, 113 P.R. Dec. 517 (1982). Euromotion charges
that BMW violated that duty. The district court did not
explore the question whether BMW had terminated negotiations
with Euromotion in bad faith because it found that Euromotion
had failed to demonstrate that Euromotion and BMW ever reached
the point of becoming involved in contract negotiations. 
Euromotion asserts that it is "indisputable" in light
of the evidence that the court, in reaching its conclusion,
improperly weighed the credibility of the witnesses. Since our
review is de novo, see Griggs-Ryan, 904 F.2d at 115, we need
not consider whether the specific reasoning set out by the
district court contained errors. Rather, we ask whether the
evidence presented by Euromotion was adequate to establish that
negotiations sufficient to be regarded as such ever took place
between the parties. Cf. Celotex Corp., 477 U.S. at 322
(stating that, in order to avoid a properly supported motion
for summary judgment, a nonmoving party must make a "showing
sufficient to establish the existence of an element essential
to that party's case, and on which that party will bear the
burden of proof at trial"). We find Euromotion's evidence
insufficient to establish that a course of negotiations looking
to the creation of a dealer's contract ever occurred. We
therefore affirm the district court.
According to Euromotion, the following facts
constituted negotiations between itself and BMW. First,
Euromotion's president was interviewed by BMW, along with other
candidates, to determine whether to select Euromotion for the
position of dealer. Second, BMW encouraged Euromotion in 1993
to continue to sell BMW automobiles, as it was then doing, and
develop a market in Puerto Rico. Third, BMW urged Fields BMW
at that time to aid Euromotion in developing the Puerto Rican
market, as it had been doing for a while. Fourth, because
Euromotion's president believed that Euromotion was being
considered as a candidate for the Puerto Rican dealership,
Euromotion took action to create a larger market for BMW's cars
in Puerto Rico. Fifth, Euromotion kept BMW informed of its
progress.
None of the above, in our view, were negotiations
such as might trigger the duty of good faith in the Puerto
Rican Civil Code. Rather they were preliminary activities and
dealings reflecting, among other things, a modicum of initial
interest by BMW in Euromotion's activities as an independent
salesman of BMW vehicles, and also reflecting Euromotion's
intense but unsuccessful efforts to become a finalist for the
dealership position. While BMW encouraged Euromotion to
proceed with its independent sales of BMW cars and interviewed
Euromotion's president along with others, BMW never selected
Euromotion as someone with whom it intended to negotiate a
dealership contract. And, in fact, no contract negotiations
ever took place. None of the interactions between the parties
addressed the concerns that parties looking to form a dealer
relationship would address. BMW and Euromotion did not discuss
inventory requirements, sales goals, promotional allowances,
showroom standards, trademark use, minimum service facilities,
warranty conditions, payment and credit arrangements, letters
of credit, or personnel and staffing requirements. Further,
the record establishes that Euromotion never submitted the
required dealer application to BMW and never saw the BMW
authorized dealer standard agreement. Lastly, Euromotion's
letter to BMW in December of 1993 confirms that Euromotion
understood itself to be just one candidate among several. The
district court concluded that: "None of this [evidence
presented by Euromotion] constitutes contract 'negotiations' by
any stretch of the imagination." We agree. 
It is true, of course, that "when the facts support
plausible but conflicting inferences on a pivotal issue in the
case, the judge may not choose between those inferences at the
summary judgment stage." Coyne v. Taber Partners I, 53 F.3d
454, 460 (1st Cir. 1995); see also Anderson, 477 U.S. at 249
(noting that a judge should not weigh the evidence when
considering a motion for summary judgment). Still, a court
should not indulge a nonmoving party's inferences if they do
not "flow rationally from the underlying facts." Rubinovitz v.
Rogato, 60 F.3d 906, 911 (1st Cir. 1995). On the facts of this
case viewed in the light most favorable to Euromotion, no
reasonable fact finder could conclude that BMW entered into
negotiations with Euromotion concerning the formation of a
dealership contract. It follows that BMW's refusal, for
whatever reason, to talk further with Euromotion could not
amount to a breach of Puerto Rico's doctrine requiring parties
who enter into contract negotiations to proceed in good faith. 
We hold that summary judgment was appropriate on Euromotion's
good faith claim.
Affirmed.